## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>FRANK ROMERO, individually and also d/b/a Trend Deploy, Trendeploy, trendeploy, trendeploy.com, Frank Romero Advertising, and Uvenux,<br><br><br>    Defendant. | CASE NO. 5:21-cv-343<br><br>**COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.     Plaintiff brings this action under Sections 5(a), 5(m)(1)(A), 12, 13(b), 16(a)(1), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(A), 52, 53(b), 56(a)(1), 57b, the FTC's Trade Regulation Rule Concerning the Sale of Mail, Internet, or Telephone Order Merchandise ("MITOR" or the "Rule"), 16 C.F.R. Part 435, and the COVID-19 Consumer Protection Act, Public Law 116-260, 134 Stat. 1182, Title XIV, Section 1401 ("CCPA"), to obtain permanent injunctive relief, rescission or reformation of contracts, the refund of monies paid, civil penalties, and other relief for Defendant's acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52, and in violation of MITOR, 16 C.F.R. Part 435.

1

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41–58.  The FTC enforces Sections 5(a) and 12 of the FTC Act, 15 U.S.C. § 45(a) and 52, which prohibit unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces MITOR, which requires mail-, internet-, or telephone-based sellers to have a reasonable basis for advertised shipping times, and, when sellers cannot meet promised shipping times or ship within 30 days, to provide buyers with the option to consent to a delay in shipment or to cancel an order and receive a prompt refund.  The FTC further enforces the CCPA, which makes it unlawful under Section 5 of the FTC Act for any person to engage in a deceptive act or practice in or affecting commerce associated with the treatment, cure, prevention, mitigation, or diagnosis of COVID-19 for the duration of the COVID-19 public health emergency.

## DEFENDANT

5.      Defendant Frank Romero, also doing business as Trend Deploy, Trendeploy, trendeploy, trendeploy.com, Frank Romero Advertising, and Uvenux ("Defendant"), resides in this District, and in connection with the matters alleged

2

herein, transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, Romero has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant has advertised, marketed, distributed, or sold personal protective equipment ("PPE") to consumers throughout the United States.

## COMMERCE

6.     At all times relevant to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS ACTIVITIES

7.     On January 31, 2020, Health and Human Services Secretary Alex M. Azar II, pursuant to his authority under Section 319 of the Public Health Service Act, declared a public health emergency, which remained in effect throughout the activities detailed below, and beyond.

8.     Seeking to capitalize on demand for PPE because of the COVID-19 pandemic, Defendant began marketing facemasks and other PPE on his website, www.trendeploy.com, in March 2020.  Defendant promised consumers "fast shipping" of five to fifteen days, or "standard shipping" of three to five weeks.

9.     Defendant's shipping promises were, in many cases, false.  In fact, consumers waited weeks or months to receive their orders, and some orders never

arrived.  When consumers complained, Defendant frequently responded with stock emails, rather than information about their individual order.

### Defendant's Shipping Practices

10.     Defendant markets and sells goods to consumers throughout the United States via his trendeploy.com website, including car accessories, collectibles, fitness products, home gadgets, and other technology parts.  Defendant also sells clothing to consumers throughout the United States through his website, www.uvenux.com.

11.     During the early months of the pandemic in the United States, obtaining PPE and related products as quickly as possible was paramount for many consumers.  PPE was in high demand and difficult to find.

12.     In response to this demand, on or around March 13, 2020, Defendant began selling facemasks on trendeploy.com, including the facemasks he described as "N95" and "Class N95."

### The Checkout Process on Defendant's Website

13.     After selecting a facemask on Defendant's website, consumers began a four-part checkout process.  The website first directed consumers to a webpage called "My Cart," depicted below.



Ex. A (June 11, 2020 Screenshot) (The "My Cart" webpage).

14.     No representations or disclaimers regarding shipping times appeared on the "My Cart" webpage.

15.     After consumers clicked the "CHECK OUT" button on the "My Cart" webpage, the website directed them to the "Information" webpage, depicted below.



Ex. B (June 11, 2020 Screenshot) (The "Information" webpage).

16.    There were no representations or disclaimers about shipping times on the "Information" webpage.

17.    After inputting their shipping information and clicking on the "Continue to shipping" button, the website directed consumers to the "Shipping Method" webpage, depicted below.

6



Ex. C (June 11, 2020 Screenshot) (The "Shipping Method" webpage).

18.    This webpage offered consumers two shipping options:  1) "Fast Shipping (5-15 days)"; and 2) "Standard Shipping (3-5 weeks)."

19.    No disclaimers regarding shipping times appeared on this webpage. After consumers selected a shipping option and click the "Continue to payment"

button, the website directed them to the "Payment" webpage, depicted below.



Ex. D (June 11, 2020 Screenshot) (The "Payment" webpage).

20.   To complete their transaction, on this final page, consumers entered their credit card, debit card, PayPal, or other payment information and clicked the "Complete Order" button.

21.   The "Payment" webpage contained no disclaimer about shipping times.

8

## **Hidden Shipping Disclaimers**

22.     Several of the pages, including the "My Cart" on the Defendant's website, included hyperlinks to "Shipping" and "FAQ" webpages, depicted in Exhibit A.

23.      The hyperlinked "Shipping" webpage stated that the time periods identified in both the "Fast Shipping" and the "Standard Shipping" options did not include the Defendant's additional "shipping and processing time" of 1-5 business days.

24.     From at least April 28, 2020 through at least November 2, 2020, this Shipping page stated Defendant was "able to deliver within the estimated deliver [sic] dates, but events such as holidays, sales, weather conditions, etc., may affect our shipping / delivery time.  In extreme cases, orders may take up to **40** days to arrive. If after **40** days, you have yet to receive your order, we will either **issue a replacement, or refund your money** no questions asked" (emphasis in original).

25.     The hyperlinked "FAQ" webpage similarly stated each shipping method has "an estimated range of days/weeks it would take for the order to reach its destination."  It further stated, "[k]eep in mind this range of days/weeks does not include the days it takes us to ship your order (1 to 5 business days)."

26.     Consumers could only see these disclaimers if they clicked on the "FAQ" or "Shipping" hyperlinks at the bottom of the website.

27.     Consumers could not navigate directly to the Shipping page during the checkout process.

28.     Consumers could not navigate to the FAQ page during the checkout process.

29.     During the checkout process, consumers could click on hyperlinks to Trend Deploy's "Terms of Service," "Privacy Policy," and "Returns Policy," see Exhibits B, C, and D.

30.     Neither Trend Deploy's Terms of Service nor its Privacy Policy contained any disclaimers about shipping times.

31.     The hyperlink to the "Returns Policy" directed consumers to a webpage called the "Store Policy," which did not include the disclaimer regarding the Defendant's additional "shipping and processing time" of 1-5 business days.

32.     The Store Policy stated, in part:

## STORE POLICY

As consequence of the unprecedented novel coronavirus (COVID-19), we're experiencing an unforeseen and unanticipated spike in the volume of orders which may affect our standard shipping/delivery times. We're working diligently to prepare and ship all orders as soon as possible! We understand the frustration of having to wait for orders longer than expected, but one thing we don't want to sacrifice is the quality of our service. Our main goal at this moment is to guarantee delivery rather than delivery time. We appreciate your patience as we work to resolve this. Thank you! Our peace of mind rests in the fact that we've successfully delivered hundreds of thousands of orders, all without a SINGLE lost item!

Ex. E (June 11, 2020 Screenshot).

10

**Defendant's Representations Regarding Shipping Time, His Failure to Meet Them, and His Failure to Offer Prompt Refunds to Consumers**

33.     In numerous instances, for both consumers who chose Fast Shipping and for consumers who chose Standard Shipping, Defendant failed to ship purchased goods within the time stated in the solicitation.

34.     In numerous instances, for both consumers who chose Fast Shipping and for consumers who chose Standard Shipping, Defendant failed to meet delivery dates for purchased goods within the time stated in the solicitation.

35.     In numerous instances, for both consumers who chose Fast Shipping and for consumers who chose Standard Shipping, Defendant failed to meet promised delivery dates for consumers, even accounting for an extra "shipping and processing time" of 1-5 business days.

36.     For example, on March 18, 2020, the wife of one essential worker purchased masks Trend Deploy described as "N95" after seeing them advertised on Facebook.  She chose the "Fast Shipping" option of 5-15 days.  She did not receive facemasks until May 28, 2020, more than ten weeks after placing her order.  Defendant never offered her a refund or the chance to consent to a delay in shipping.

37.     In another example, on April 1, 2020, a nurse working at a retirement village purchased five masks Trend Deploy described as "Class N95" after looking for masks online.  She chose the "Standard Shipping" option of three to five weeks.  As of June 25, 2020, more than 12 weeks after she placed her order, she had not

received her masks.  Defendant never offered her a refund or the chance to consent to a delay in shipping.

38.    Other consumers only received part of their facemask orders from Defendant.  Defendant never offered these consumers a refund or the option to consent to a delay in shipping.

39.    Still other consumers never received any facemasks from Defendant. Defendant never offered these consumers a refund or the option to consent to a delay in shipping.

40.    Defendant utilized a stock "update" email regarding facemasks, which he automatically sent to consumers who sent any inquiry to Trend Deploy's email address.  This email read:  "We want to thank you for choosing Trend Deploy.  If you've made a purchase recently, we're delighted to let you know that your shipment is being taken care of as we speak.  If you've already received shipment confirmation and tracking info, rest assured, your order is well on its way."

41.    The stock email Defendant sent to consumers continued:  "As consequence [sic] of the unprecedented novel coronavirus (COVID-19), we're experiencing an unforeseen and unanticipated spike in the volume of orders which may affect our standard shipping/delivery times.  We're working diligently to prepare and ship all orders as soon as possible!  We understand the frustration of having to wait for orders longer than expected, but we can't sacrifice the quality of our service by rushing orders.  Our main goal at this moment is to guarantee delivery.  We appreciate your patience as we work to resolve this.  Thank you!"

42.     Similarly, in emails responding to consumer inquiries, Defendant stated, "In extreme cases, orders may take up to 60 days to arrive, in which case, a full refund will be issued to our customers as per our policy.  This rarely happens, but if it were to happen, you'd be covered under our policy for a refund and you may keep the parcel."

43.     At the time Defendant sent these emails, he knew he could not ship merchandise in the time he promised.

44.     In numerous instances when Defendant could not ship merchandise within the timeframe promised in his solicitations, he failed to offer consumers the option either to consent to a delay in shipping or to cancel their orders and receive a prompt refund.

45.     In numerous instances, when Defendant did offer the option to obtain a refund, he only did so by offering store credit.  Defendant did not offer a refund in the manner through which the consumer tendered payment, or by means of cash, check, or money order within seven working days of the date Defendant discovered he could not provide a refund by the same method as the consumer tendered payment.

46.     Defendant received numerous complaints regarding his shipping delays and failures via email.  Defendant responded to some of these messages by telling consumers that their orders had shipped or would ship soon.

47.     If Defendant claimed that the order had shipped, he told consumers that refunds were unavailable.

13

48.     If Defendant claimed that the order had not shipped, he only offered refunds in the form of store credit, as described above in Paragraph 45.

**Defendant's Claims Regarding the Quality of Three Types of Facemasks**

49.     Beginning in March 2020 and continuing through at least March 19, 2021, Defendant has marketed three types of facemasks with claims concerning their quality, including claims concerning the masks' efficacy as particle barriers: "N95" masks; masks that he alternatively described as "Class N95" or "KN95"; and masks that he described as "PM 2.5."

50.     By no later than April 2020, Defendant was aware that he must substantiate any express or implied claims he makes about the efficacy of a facemask, or any other antivirus property of a facemask.

*The "N95" Facemasks*

51.     Beginning in March through at least April 2020, Defendant sold various masks he described as "N95," including:

   a)     5 Layer N95 & PM 2.5 Micro-Particle Barrier Double Filter;

   b)     N95 PM 2.5 Anti-Virus Micro Particle Barrier Face Mask (Reusable With Activated Carbon Filter);

   c)     N95 & PM2.5 Double-Filter, Anti-Virus, Micro Particle Barrier Face Mask;

   d)     N95 & PM2.5 Double-Filter, Anti-Virus 6 Layer Protection Micro-Particle Barrier Respirator Mask;

   e)     N95 PM2.5 Activated Carbon Filter Anti-Virus Micro Particle Barrier Face Mask (100% Reusable & Made in U.S.A.); and

   f)     Professional N95 & PM 2.5 Activated Carbon Anti-Virus Micro Particle Barrier Filter.

14

52. On social media, Defendant advertised his N95 masks, as shown in the below example:



Ex. F (March 13, 2020 advertisement posted on Trend Deploy's Instagram page).

53. In these advertisements, Defendant associated his N95 facemasks with COVID-19 prevention or mitigation by using the hashtag "coronavirus." He also used the hashtag "antivirus [] mask."

54.     An N95 respirator is a filtering facepiece respirator ("FFR").  These FFRs are designed to achieve a very close facial fit and very efficient filtration of airborne particles.  Specifically, an N95 respirator filters out at least 95 percent of airborne matter.

55.     When, prior to purchase, consumers inquired if Defendant sold N95 masks certified by the National Institute for Occupational Safety and Health ("NIOSH"), Defendant confirmed he did.

56.     NIOSH certifies respirators according to the standards it promulgated under 42 C.F.R. § 84.

57.     There are certain markings on all NIOSH-approved N95 respirators. These markings include an approval number, which begins with a "TC" prefix, as well as a marking that says "NIOSH."

58.     NIOSH-approved N95 respirators use headbands, and not ear loops, to attach to the user's face.

59.     NIOSH-approved N95 respirators do not have decorative colors, patterns, fabrics, or other decorative add-ons present.

60.     NIOSH does not approve any respiratory protection for children. Accordingly, a NIOSH-approved N95 respirator for children does not exist.

61.     Defendant has never submitted a facemask to NIOSH for approval, whether for certification as an N95 respirator or otherwise.

62.     Eight manufacturing companies or individuals associated with Defendant (Xiantao Dingcheng Nonwoven Products Co., Ltd.; Guangzhou Jizhi

Trading Company; Anhui Mileno Trading Co., Ltd.; Yiwu Liangmei Apparel Firm; Focal Allure; Golden Bei; Adam Chan; and Lanxi Lvjian Protective Equipment Co., Ltd.) have never submitted a facemask to NIOSH for approval, whether for certification as an N95 respirator or otherwise.

63.     Thus, Defendant never sent N95 facemasks to consumers who ordered N95 facemasks, and instead sent inferior KN95 facemasks or cloth facemasks.

64.     For example, one consumer who works at a hospital ordered N95 masks from Defendant.  She received reusable cloth masks, pictured below.



Ex. G (Photographs of facemasks received by a consumer who ordered N95 masks).

65.     Another consumer who ordered N95 masks instead received the reusable cloth masks pictured below.



Ex. H (Photographs of facemasks received by consumer who ordered N95 masks).

66.    Yet another consumer who ordered masks Defendant marketed as N95 masks, including a "Child" N95 mask, did not receive the promised masks, and instead received only reusable cloth masks such as the one pictured below.



Ex. I (Photograph of facemask received by a consumer who ordered N95 masks, including mask advertised as a "Child" N95 Mask).

18

*The "Class N95" or "KN95" Facemasks*

67.    Beginning in March 2020 through at least March 19, 2021, Defendant also sold masks he described as "Class N95," or as "KN95," which Defendant claimed had the same filtration efficiency as N95 masks.  The products of this type Defendant sold included:

a)    Class N95 Protection Micro-Particle Barrier Fitted Mask;

b)    Class N95 & PM 2.5 Anti-Virus Micro-Particle Barrier Respirator Mask With Valve;

c)    Class N95 & PM 2.5 Certified 5 Layer Activated Carbon Filter Face Mask; and

d)    FKN95 Filter Micro-Particle Barrier Antiseptic Respirator (100% Reusable Anti-Virus Protection Mask).

68.    As shown below, Defendant's website also described the "Class N95" masks as a "protection class" of "N95," a "safety standard" of "NOISH [sic] 42 CFR 84," and included images of masks stamped KN95.



Ex. J (March 19, 2021 screenshot of Defendant's website).



Ex. K (December 2, 2020 screenshot of Defendant's website).

69.    Defendant claimed the Class N95 masks he sold would prevent or mitigate COVID-19.

70.    For example, he described one Class N95 mask as an "Anti-Virus Micro-Particle Barrier Respirator Mask" and described one of its functions as "Virus Protection."  He described another Class N95 mask as a "Micro-Particle Barrier."

21

71.     Since at least March 2020, the Centers for Disease Control and

Prevention has described a N95 FFR as "a type of respirator which removes particles

from the air that are breathed through it.  These respirators filter out at least 95% of

very small (0.3 micron) particles.  N95 FFRs are capable of filtering out all types of

particles, including bacteria and viruses."

72.     Additionally, for the facemasks Defendant depicted as "Class N95" on

his website, Defendant stated that the filtering rate is greater than or equal to 95

percent (0.075 micron particles).

73.     On social media, Defendant advertised that he was selling "Class N95"

masks, as shown in the figure below:



Ex. L (March 27, 2020 Trend Deploy Facebook post).

74.     In numerous instances, Defendant represented that his facemasks filtered at least 95% of particles, but delivered facemasks that did not meet that standard.  Consumers who ordered "Class N95" masks instead received reusable cloth masks that have a filtration efficiency of less than 95 percent.

*The "PM2.5" Facemasks*

75.     On his website, through at least March 19, 2021, Defendant advertised a facemask he described as "PM2.5 Micro Particle Barrier Face Mask (Reusable With Activated Carbon Filter)," as depicted below.



Ex. M (March 19, 2021 screenshot of Defendant's website).

76.     In numerous instances, Defendant represented that the PM2.5 facemasks filter out particles as small as 0.075 microns in size.

77.     Defendant delivered facemasks that did not meet that standard.

**Defendant's Claims Regarding Certification by Government Agencies**

78.     Using standards promulgated under 42 C.F.R. § 84, NIOSH certifies, through testing, that respirators meet the standard to qualify as "N95." After conducting initial testing on their own products showing that the products should meet these standards, companies submit respirators for approval by NIOSH.

79.     To reassure consumers that his N95 masks were legitimate, Defendant informed consumers who inquired that his masks were certified by NIOSH and sent consumers, pre-purchase, a purported certification issued by NIOSH, as pictured below.





Ex. N (Excerpt of Purported NIOSH Certification Defendant Sent to Consumers).

80.     On the trendeploy.com website, as depicted in Exhibit K, Defendant claimed that at least some of his "Class N95" facemasks met the safety standards of 42 C.F.R. § 84.

81.     On the trendeploy.com website, as depicted in Exhibit J, Defendant claimed that at least some of his "Class N95" facemasks were of the same quality as N95 masks.

82.     Neither Trend Deploy nor any of the manufacturing companies associated with it, as referenced in Paragraph 62, has ever submitted a facemask to NIOSH for approval.  Because meeting the safety standards of 42 C.F.R. § 84 requires NIOSH to test and certify compliance, Defendant's facemasks cannot meet this standard.

83.     NIOSH did not issue the certificates that Trend Deploy sent to consumers.

84.     NIOSH did not issue the task numbers and approval numbers Defendant listed in certificates he sent to consumers.

85.     NIOSH only permits companies to use the NIOSH logo in connection with the sale of N95 respirators when NIOSH has approved the particular respirator and certified that the respirator meets the requirements set forth in 42 C.F.R. § 84.

86.     NIOSH did not give Defendant permission to use its logo.

87.     As referenced in Paragraphs 67 and 68, and as depicted in Exhibits J and K, Defendant sold "Class N95" masks for which his website depicted the images of KN95 facemasks.

88.     A KN95 mask is an FFR that filters out at least 95 percent of airborne

matter.  KN95 masks are regulated by the Chinese government under regulations

GB2626-2006, GB2626-2019, and GB19083-2010, although the manufacturer, and

not the Chinese government, certifies the masks meet the requisite standard.  The

manufacturer certifies that it has tested the filtration efficiency of its KN95 masks,

and that the filtration efficiency is greater than or equal to 95 percent.

89.     Neither NIOSH nor the FDA certifies the filtration efficiency of KN95

masks.

90.     On his website, in connection with his sale of "Class N95" facemasks,

Defendant also published a "Certification of Registration" with the FDA's logo on it,

as pictured below:



Ex. O (August 13, 2020 Screenshot of Defendant's Website).

91.     Registering with the FDA does not mean that the FDA approved or tested a product.

92.     The FDA logo is for the official use of the FDA and not for use on private sector materials.

27

93.    The FDA does not issue Registration Certificates to medical device manufacturers.

94.    The FDA did not issue the certification that Trend Deploy provided to consumers.

95.    Defendant removed the claims detailed in Paragraphs 67-77 no earlier than March 19, 2021.  Notably, he continued to make the claims after he was on notice that the FTC was investigating whether his marketing and sale of facemasks violated Section 5 of the FTC Act and MITOR on November 3, 2020.  Moreover, he persisted in making the claims even after the FTC notified him that the claims violated the FTC Act and were subject to penalties under the CCPA on February 16, 2021.

96.    Defendant continued these unlawful acts or practices, as well as others, despite knowledge of numerous complaints and messages from consumers and service providers regarding substantiation of his claims.

97.    Defendant only removed the fake FDA certificate referenced in Paragraph 90 and depicted in Exhibit O after the FTC served a Civil Investigative Demand on him and conducted its investigational hearing of Defendant on December 3, 2020.

98.    Based on the facts and violations of law alleged in this Complaint, Plaintiff has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission.  Among other things, Defendant willfully engaged in unlawful acts or practices by:  (1) advertising N95 respirators but not delivering N95

28

respirators to consumers, (2) posting and distributing counterfeit government certifications to consumers, and (3) offering shipping and delivery timeframes without a reasonable basis.  Finally, Defendant's websites are still operational, and Defendant retains the means, ability, and incentive to continue his unlawful conduct in the PPE business.

## VIOLATIONS OF THE MAIL, INTERNET, OR TELEPHONE ORDER MERCHANDISE RULE

99.     MITOR, 16 C.F.R. Part 435, prohibits sellers from soliciting any order for the sale of merchandise ordered through the mail, via Internet, or by telephone "unless at the time of the solicitation, the seller has a reasonable basis to expect that it will be able to ship any ordered merchandise to the buyer" either "[w]ithin that time clearly and conspicuously stated in any such solicitation; or [i]f no time is clearly and conspicuously stated, within thirty (30) days after receipt of a properly completed order from the buyer."  16 C.F.R. § 435.2(a)(1).

100.    "Receipt of a properly completed order" means "where the buyer tenders full or partial payment . . . the time at which the seller receives both said payment and an order from the buyer containing all of the information needed by the seller to process and ship the order."  16 C.F.R. § 435.1(c).

101.    When a consumer makes payment by a "credit sale" under MITOR, "Refund" means, where a third party is the creditor, "an appropriate credit memorandum or the like sent to the third party creditor which will remove the charge from the buyer's account and a copy of the credit memorandum or the like

29

sent to the buyer that includes the date that the seller sent the credit memorandum or the like to the third party creditor and the amount of the charge to be removed, or a statement from the seller acknowledging the cancellation of the order and representing that it has not taken any action regarding the order which will result in a charge to the buyer's account with the third party."  16 C.F.R. § 435.1(d)(2)(ii).

102.   When a consumer makes payment by means other than cash, check, money order, or credit sale, "Refund" means (i) "[i]nstructions sent to the entity that transferred payment to the seller instructing that entity to return to the buyer the amount tendered in the form tendered and a statement sent to the buyer setting forth the instructions sent to the entity, including the date of the instructions and the amount to be returned to the buyer; or (ii) [a] return of the amount tendered in the form of cash, check, or money order sent to the buyer; or (iii) [a] statement from the seller sent to the buyer acknowledging the cancellation of the order and representing that the seller has not taken any action regarding the order which will access any of the buyer's funds."  16 C.F.R. § 435.1(d)(3).

103.   Where a "Refund" is made pursuant to 16 C.F.R. § 435.1(d)(2)(ii) or 16 C.F.R. § 435.1(d)(3), "Prompt Refund" means "a refund sent by any means at least as fast and reliable as first class mail within seven (7) working days of the date on which the buyer's right to refund vests under [MITOR]."  16 C.F.R. § 435.1(b)(1). If the seller cannot provide a refund by the same method payment was tendered, Prompt Refund "shall mean a refund sent in the form of cash, check, or money order, by any means at least as fast and reliable as first class mail, within seven (7)

working days of the date on which the seller discovers it cannot provide a refund by the same method as payment was tendered." *Id.*

104.   "Shipment" means the act of physically placing the merchandise in the possession of a carrier.  16 C.F.R. § 435.1(e).

105.   Where a seller is unable to ship merchandise within the seller's advertised time or within 30 days if no time is given, the seller must offer to the buyer "clearly and conspicuously and without prior demand, an option either to consent to a delay in shipping or to cancel the buyer's order and receive a prompt refund." 16 C.F.R. § 435.2(b)(1).

      a)   Any such offer "shall be made within a reasonable time after the seller first becomes aware of its inability to ship." 16 C.F.R. § 435.2(b)(1).

      b)   The offer must fully inform the buyer of the buyer's right to cancel and provide a definite revised shipping date or inform the buyer that the seller cannot make any representation regarding the length of the delay.  16 C.F.R. § 435.2(b)(1)(i).

106.   A seller must "deem an order canceled and . . . make a prompt refund to the buyer whenever the seller receives, prior to the time of shipment, notification from the buyer cancelling the order pursuant to any option [under MITOR] . . . [or] [t]he seller fails to offer the option [to consent to a delay or cancel required by § 435.2(b)(1)] and has not shipped the merchandise" within the time required by MITOR.  16 C.F.R. § 435.2(c), (c)(1), and (c)(5).

107.   Pursuant to Section 18 of the FTC Act, 15 U.S.C. § 57a(d)(3), and 16 C.F.R. § 435.2, a violation of MITOR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

108.   Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties of up to $43,792 for each violation of MITOR, 16 C.F.R. § 1.98(d).

### Count I – MITOR Violations

109.   In numerous instances, when Defendant:

a)   represents he will ship purchased goods within fifteen days, he does not have a reasonable basis to expect to ship the goods within fifteen days;

b)   represents he will ship purchased goods within five weeks, he does not have a reasonable basis to expect to ship the goods within five weeks;

c)   fails to ship orders within the timeframe required by MITOR, he also fails to offer consumers the opportunity to consent to a delay in shipping or to cancel their order and receive a prompt refund;

d)   fails to ship orders within the timeframe required by MITOR and fails to offer consumers the opportunity to consent to a delay in

shipping or to cancel their order, he does not cancel those orders or provide consumers a prompt refund;

e)      receives cancellation and refund requests from consumers pursuant to any option under MITOR, he does not deem those orders cancelled or provide a prompt refund.

110.    Defendant's practices as alleged in Paragraph 109 violate MITOR, 16 C.F.R. § 435.2(a), (b), and (c), and therefore are unfair or deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

111.    Defendant committed violations of MITOR with actual knowledge or knowledge fairly implied that their actions were deceptive or unfair and violated MITOR.

## VIOLATIONS OF THE FTC ACT

112.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

113.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

114.    Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics. For purposes of Section 12, facemasks sold by Defendant are "devices" as defined in Section 15(d) of the FTC Act, 15 U.S.C.§ 55(d).

115.    Enacted on December 27, 2020, the CCPA makes it unlawful, for the duration of the public health emergency declared on January 31, 2020, pursuant to Section 319 of the Public Health Service Act, for any person, partnership, or corporation to "engage in a deceptive act or practice in or affecting commerce in violation of Section 5(a) of the [FTC] Act (15 U.S.C. 45(a)) that is associated with . . . the treatment, cure, prevention, mitigation, or diagnosis of COVID-19."  Public Law 116-260, 134 Stat 1182, Title XIV, Section 1401(b)(1).

116.    The CCPA provides that "[a] violation of subsection (b) shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under Section 18(a)(1)(B) of the [FTC] Act," 15 U.S.C. § 57a(a)(1)(B).

117.    Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties of up to $43,792 for each violation of Section 5(a) of the FTC Act pursuant to the CCPA, 16 C.F.R. § 1.98(d).

## <u>Count II – Section 5 Violations</u>

118.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of goods, specifically PPE and in particular facemasks, Defendant has represented, directly or indirectly, expressly or by implication, that he:

> a)    will ship purchased goods within five to fifteen days of purchase when consumers select "Fast Shipping";

b)      will deliver purchased goods within five to fifteen days of purchase when consumers select "Fast Shipping";

c)      will ship purchased goods within three to five weeks of purchase when consumers select "Standard Shipping";

d)      will deliver purchased goods within three to five weeks of purchase when consumers select "Standard Shipping";

e)      will deliver N95 respirators to consumers;

f)      will deliver facemasks with filtration efficiency comparable to that of an N95 respirator;

g)      will deliver facemasks with a filtration efficiency greater than or equal to 95 percent;

h)      will deliver facemasks that will filter out particles as small as 0.075 microns;

i)      will deliver facemasks that prevent viruses, including the SARS-CoV-2 virus, from passing through them;

j)      will deliver facemasks certified by NIOSH; and

k)      will deliver facemasks certified by the FDA.

119.   On or after December 27, 2020, Defendant made the representations set forth in Paragraph 118(f), (g), (h), and (i), which are associated with the treatment, cure, prevention, mitigation, or diagnosis of COVID-19.

120.   In truth and in fact, in numerous instances in which Defendant has made the representations set forth in Paragraph 118, Defendant:

35

a)      failed to ship purchased goods within five to fifteen days of purchase when consumers selected "Fast Shipping";

b)      failed to deliver purchased goods within five to fifteen days of purchase when consumers selected "Fast Shipping";

c)      failed to ship purchased goods within three to five weeks of purchase when consumers selected "Standard Shipping";

d)      failed to deliver purchased goods within three to five weeks of purchase when consumers selected "Standard Shipping";

e)      failed to deliver N95 respirators to consumers;

f)      failed to deliver facemasks with filtration efficiency comparable to that of an N95 respirator;

g)      failed to deliver facemasks with a filtration efficiency greater than or equal to 95 percent;

h)      failed to deliver facemasks that will filter out particles as small as 0.075 microns;

i)      failed to deliver facemasks that prevent viruses, including the SARS-CoV-2 virus, from passing through them;

j)      failed to deliver facemasks certified by NIOSH; and

k)      failed to deliver facemasks certified by the FDA.

121.    Therefore, Defendant's representations as set forth in Paragraphs 118 and 119 are false, misleading, or unsubstantiated, and constitute deceptive acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

122.    Defendant committed the violations set forth in Paragraphs 118 through 120 with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## CONSUMER INJURY

123.    Consumers are suffering, have suffered, and will continue to suffer substantial injury because of Defendant's violations of the FTC Act and MITOR. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b; MITOR; and the Court's own equitable powers, requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act and MITOR by Defendant;

B.    Award such relief pursuant to Section 19 of the FTC Act as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of MITOR and Section 5 pursuant to the CCPA, including rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair or deceptive act or practice;

C.    Award Plaintiff monetary civil penalties from Defendant for every violation of MITOR;

37

D.      Award Plaintiff monetary civil penalties from Defendant for every

violation of Section 5(a) of the FTC Act pursuant to the CCPA; and

E.      Award Plaintiff the costs of bringing this action, as well as such other

and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

JAMES REILLY DOLAN
Acting General Counsel

Dated:  June 29, 2021

/s/ Christopher J. Erickson
Christopher J. Erickson (cerickson@ftc.gov)
(Maryland Bar No. 1712130163)
Michael P. Mora (mmora@ftc.gov)
(Illinois Bar No. 6199875)
Federal Trade Commission
600 Pennsylvania Avenue, NW, CC-9528
Washington, DC 20580
202-326-3671 (Erickson);
202-326-3373 (Mora)
202-326-3197 (facsimile)
FEDERAL TRADE COMMISSION