**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**CASE NO.: 5-21-cv-343**

FEDERAL TRADE COMMISSION,

      Plaintiff,

v.

FRANK ROMERO, individually and also
d/b/a Trend Deploy, Trendeploy, trendeploy,
trendeploy.com, Frank Romero Advertising,
and Uvenux,

      Defendant

_____/

## DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT

      Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants, Frank Romero, individually, and also

d/b/a Trend Deploy, Trendeploy, trendeploy, trendeploy.com, Frank Romero Advertising, and

Uvenux ("Mr. Romero", "Trend Deploy," or "Defendant"), by and through the undersigned law

firm, move to dismiss the Federal Trade Commission's ("Commission") Complaint [D.E. 1], and

in support thereof state as follows:

## I. __INTRODUCTION__

Mr. Romero is the owner of an e-commerce business, which does business as Trend Deploy.  Trend Deploy sells, *inter alia,* a variety of fitness-related products sourced through Mr. Romero's international business relationships. During the early weeks and months of the COVID-19 pandemic, private businesses, such as Trend Deploy, were in a position to seek personal protective equipment ("PPE") through their international relationships to source, fulfill, and ship, facemasks to U.S. consumers.  The Federal Trade Commission ("Commission") seeks to hold the Defendant legally responsible for shipping delays and unsatisfactory goods that resulted from the Defendant's PPE suppliers' inability to live up to their promises to Defendant during the initial phases of the pandemic when demand for PPE was a new phenomenon in the United States, and the suppliers of the PPE were extensively based in China.  While it was not widely known in the early phases of the pandemic, we now know that the Chinese suppliers of the PPE were unable to live up to their fulfillment and timing expectations for the PPE to be shipped to United States based distributors such as the Defendant.

Based on Trend Deploy's marketing for its facemasks, the Commission began informal investigations into Defendant's marketing of PPE but never issued an administrative Cease and Desist Order to Defendant stating what purported acts on the part of the Defendant violated the Federal Trade Commission Act ("FTC Act"). Instead, the Commission filed this lawsuit, with the crux of the case concerning (i) Trend Deploy's alleged failure to timely ship purchased facemasks (during the peak of the COVID-19 pandemic); and (ii) alleged deception related to the markings displayed on the facemask and the efficacy of those facemasks. However, the Commission omits from its Complaint factual allegations to indicate that the Defendant engaged in deceptive acts associated with the "treatment," the "cure," the "prevention," the "mitigation," or the "diagnosis"

of COVID-19. At best, the allegations pled by the Commission concern "anti-virus" representations, but nothing specifically pertaining to COVID-19.

Further, three months before the Commission filed this lawsuit, Mr. Romero ceased the alleged violative conduct. Thus, and especially in light of the Supreme Court's recent decision of *AMG Capital Management v. Federal Trade Commission*, 141 S. Ct. 1341 (2021), it is clear that this Court should dismiss the relief sought under the Commission's Complaint. First, the Commission fails to state grounds to seek a permanent injunction or monetary relief under Section 13(b) of the FTC Act, as to Counts I and II. Second, the Commission fails to state a claim for monetary relief under § 19, as to Count II.

## II.    BACKGROUND

For purposes of this Motion, and without waiver of any kind or the making of any admissions by Defendant, Defendant herein below summarizes the allegations in the Commission's Complaint.

### A.    Trend Deploy's Business

The fitness-related products marketed and sold by Trend Deploy include PPE-related products, such as facemasks. [D.E. 1, ¶¶ 10, 12]. Importantly, Mr. Romero associates with Chinese distributors, [D.E. 1, ¶ 62], for handling the order fulfillment and shipment of the purchased facemasks. Because the global COVID-19 pandemic caused international shipping delays of purchased products, Romero notified customers on his website in that regard, stating:

> As a consequence of the unprecedented novel coronavirus (COVID-19), we're experiencing an unforeseen and unanticipated spike in the volume of orders which may affect our standard shipping/delivery times. We're working diligently to prepare and ship all orders as soon as possible! We understand the frustration of having to wait for orders longer than expected, but one thing we don't want to sacrifice is the quality of our service. Our main goal at this moment is to guarantee delivery rather than delivery time. We appreciate your patience as we work to

resolve this. Thank you! Our peace of mind rests in the fact that we've successfully delivered hundreds of thousands of orders, all without a SINGLE lost item!

[D.E. 1, Ex. E].

**B.** **The Commission Does Not Plead Facts Concerning Representations Made By the Defendant that Trend Deploy's Products Will Treat, Cure, Prevent, Mitigate, or Diagnose COVID-19.**

Critically, at no time did Trend Deploy represent that any of its facemasks would treat, cure, prevent, mitigate, or diagnose COVID-19. [*See generally* D.E. 1]. Indeed, apart from a couple of barebones factual conclusions averred by the Commission in its Complaint, which the Commission's Exhibits expressly contradict, there are no facts pled that show Trend Deploy made any representation that the facemasks it was selling to consumers would in fact treat, cure, prevent, mitigate, or diagnose COVID-19. [*See* D.E. 1, ¶¶ 12, 36-37, 49-51, 55, 58; 61-68, 69-70;[1] 72-77, 79-82, 87, 90, 95-97].[2]

For example, while the Commission alleges in a conclusory fashion that Trend Deploy "claimed the Class N95 masks he sold would prevent or mitigate COVID-19," [D.E. 1, ¶¶ 69,

---

[1] While the Commission alleges in one paragraph that the Defendant claimed the "Class N95" masks he sold "would prevent or mitigate COVID-19, [D.E. 1, ¶ 69], this allegation is expressly contradicted in two ways: (1) the very next paragraph serving as an "example" of this representation makes clear that any purported deceptive description used was actually related to "Anti-Virus Micro-Particle Barrier Respirator Mask", or "Virus Protection", or " "Micro-Particle Barrier", not COVID-19 [D.E. 1, ¶ 70]; and (2) the Exhibit K displays an image of the sale of the Class N95 mask, which does not make any representation related to COVID-19, and which expressly contradicts the conclusory factual allegation made by the Commission. [*Compare* D.E. 1, ¶ 69, *with* D.E. 1, Ex. K.].

[2] The closest factual allegation raised by the Commission related to "associating" Mr. Romero's facemasks with COVID-19 comes through use of a social media hashtag, which appears to have taken place nine months before the COVID-19 Consumer Protection Act was enacted on December 27, 2020, as discussed further *infra* Section II(C). [D.E. 1, Ex. J]. But, as shown in Exhibit J, there is still no representation that the facemasks will treat, cure, prevent, mitigate, or diagnose COVID-19. *Id.*

**COLE, SCOTT & KISSANE, P.A.**
COLE, SCOTT & KISSANE BUILDING - 9150 SOUTH DADELAND BOULEVARD - SUITE 1400 - P.O. BOX 569015 - MIAMI, FLORIDA 33256 - (305) 350-5300 - (305) 373-2294 FAX

118(i)], the exhibits expressly contradict this statement. [D.E. 1, Ex. J; Ex. K.].[3] Indeed, the

Exhibits unambiguously show Trend Deploy describing the facemask as "Class N95 & PM2.5

Anti-Virus Micro-Particle Barrier Respirator Mask" with no claim being made whatsoever that

this mask would treat, cure, prevent, mitigate, or diagnose COVID-19. *Id.* Further, the Exhibit J

shows under "function" that Trend Deploy describes the facemask as "anti-dust, anti-pollution,

virus protection, micro-particle barrier," [D.E. 1, ¶ 70; Ex. J]. The Commission does not allege

that any of these descriptions equate to deceptive representations that the facemasks treat, cure,

prevent, mitigate, or diagnose COVID-19. *Id.* Further, the Commission does not allege any facts

that use of the term "virus" means "COVID-19." [*See generally* D.E. 1].  Even the Centers for

Disease Control and Prevention ("CDC") did not make a representation that "N95" facemasks

would treat, cure, prevent, mitigate, or diagnose COVID-19. [D.E. 1, ¶ 71] ("Since at least March

2020, the [CDC] has described a N95 FFR as a 'type of respirator which removes particles from

the air that are breathed through it . . . capable of filtering out all types of particles, **including

bacteria and viruses**.") (emphasis added).

Similarly, the Commission alleges that Trend Deploy sold products including:

1. Class N95 Protection Micro-Particle Barrier Fitted Mask;
2. Class N95 & PM 2.5 **Anti-Virus** Micro-Particle Barrier Respirator Mask with Valve;
3. Class N95 & PM 2.5 Certified 5 Layer activated Carbon Filter Face Mask; and
4. FKN95 Filter Micro-Particle Barrier Antiseptic Respirator (100% Reusable **Anti-Virus** Protection Mask)

[D.E. 1, ¶ 67] (emphasis added). Yet, nothing above makes reference to a statement by Defendant

that Trend Deploy's products will treat, cure, prevent, mitigate, or diagnose COVID-19. *Id.*

---

[3] When Exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern. *See Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007).

Moreover, the Complaint avers generally that "by no later than April 2020" Trend Deploy knew it needed to substantiate claims made regarding the facemasks "or any other antivirus property" of Trend Deploy's facemask. [D.E. 1, ¶ 50]. Even taken as true, which is not supported by any administrative Cease and Desist Letter attached to the Complaint, the Commission still does not allege how this would equate to a representation that Trend Deploy's products treat, cure, prevent, mitigate or diagnose COVID-19. [*See generally* D.E. 1].  Further, such allegation is at odds with the Commission's admission that even as far into November 2020, the Commission was still "investigating" whether Trend Deploy's marketing of its facemasks "violated Section 5 of the FTC Act." [D.E. 1, ¶ 95]. In addition, in furtherance of its investigation, the Commission goes on to allege that it served a Civil Investigative Demand on Mr. Romero where the Commission conducted its investigational hearing on December 3, 2020, [D.E. 1, ¶ 97] presumably to determine whether a violation of § 5 occurred. In other words, while the Commission claims in April 2020 Mr. Romero had actual knowledge that PPE claims required substantiation, eight months later the Commission was still investigating whether Trend Deploy's marketing violated the FTC Act.

### C.      The Commission Did Not Issue Trend Deploy a Final Cease and Desist Order.

What is clear in the Complaint, however, is the Commission did not commence an administrative proceeding against Mr. Romero relative to the marketing of facemasks. [*See generally* D.E. 1]. Nor does the Complaint allege that the Commission issued an Administrative Cease and Desist Order against Mr. Romero relative to the facemasks which would explain with specificity what acts the Commission found as violating the FTC Act. [*See generally* D.E. 1].

Importantly, for purposes of the factual timeline, on December 27, 2020, the COVID-19 Consumer Protection Act ("CCPA") was enacted. Though the CCPA is described in greater detail below, the CCPA does not reflect any clear Congressional intent that the Act applies retroactively

**COLE, SCOTT & KISSANE, P.A.**
COLE, SCOTT & KISSANE BUILDING - 9150 SOUTH DADELAND BOULEVARD - SUITE 1400 - P.O. BOX 569015 - MIAMI, FLORIDA 33256 - (305) 350-5300 - (305) 373-2294 FAX

to conduct *before* its enactment date. In the absence of such clear Congressional intent, retroactive application of legislation that imposes penalties for conduct which before its enactment were not applicable is disfavored as a matter of public policy and federal constitutional law.[4] As a result, conduct related to COVID-19, pre-dating December 27, 2020, is not subject to the CCPA. Consequently, the Commission is attempting to circumvent a required administrative proceeding by squeezing all conduct (before and after December 27, 2020) that relates to "anti-virus" claims as falling within the narrow purviews of the CCPA's prohibition related to "COVID-19."

For instance, throughout the Commission's 38-page Complaint, the Commission devotes nearly all of its images in support of its claims on conduct that overwhelmingly predated December 27, 2020, [*Compare* D.E. 1, Ex. A (June 11, 2020 screenshot); Ex. B (June 11, 2020 screenshot); Ex. C (June 11, 2020 Screenshot); Ex. D (June 11, 2020 screenshot); Ex. E. (June 11, 2020 screenshot); Ex. F (March 13, 2020 screenshot); Ex. K (December 2, 2020 screenshot); Ex. L (March 27, 2020 Facebook post); Ex. N (undated image); Ex. O (August 13, 2020 Screenshot), *with* D.E. 1, Ex. J (March 19, 2021 screenshot); Ex. M (March 19, 2021 screenshot)]. The few allegations that fall *after* December 27, 2020, fail to identify Defendant's alleged unlawful conduct in connection with <u>any</u> representations made by Defendant concerning the treatment, cure, prevention, mitigation, or the diagnosis of <u>COVID-19</u>.

Of further note, on numerous occasions, the Commission leaves open-ended allegations regarding the time frame of Trend Deploy's conduct as occurring "at least" by March 19, 2021. Yet, there are no clear allegations in the Complaint that, as date the Commission filed suit, any wrongdoing alleged is *currently* ongoing or is *likely to occur* in the near future. [*See generally* D.E. 1].

---

[4] *See infra* Section III(c)(2)(b).

**COLE, SCOTT & KISSANE, P.A.**
COLE, SCOTT & KISSANE BUILDING - 9150 SOUTH DADELAND BOULEVARD - SUITE 1400 - P.O. BOX 569015 - MIAMI, FLORIDA 33256 - (305) 350-5300 - (305) 373-2294 FAX

Nevertheless, despite the latest alleged wrongful acts occurring in March of 2021, on June 29, 2021, the Commission commenced its lawsuit. [D.E. 1].  The Commission requests relief pursuant to Sections 13(b) and 19 of the FTC Act (codified as 15 U.S.C. §§ 53(b), 57b, respectively), and pursuant to the Mail Internet or Telephone Order Merchandise Rule ("MITOR").  Under the FTC Act and MITOR, the Commission requests damages including "rescission or reformation of contracts, the refund of money or return of property, the payment of damages," and monetary civil penalties for each violation of MITOR and Section 5 of the FTC Act. [D.E. 1, pp. 37-38].  Additionally, without any substantial basis therefor, the Commission requests a permanent injunction to in effect ensure that Mr. Romero does not violate the FTC Act and MITOR in the future. [D.E. 1, p. 37].

Given the above, Trend Deploy moves to dismiss the FTC's Claims under Sections 13 and 19 on the grounds that (1) the Commission fails to state a claim for a permanent injunction for Counts I and II, and (2) the Commission failed to state a claim under Section 5(a) for Count II.

## II.   MEMORANDUM OF LAW

### A.      LEGAL STANDARD.

#### 1.    Motion to Dismiss.

A court's consideration when ruling on a motion to dismiss is generally limited to the complaint and any incorporated exhibits. *Grossman v. Nationsbank, N.A*., 225 F. 3d 1228, 1231 (11th Cir. 2000); Fed. R. Civ. P. 10(c); *see Solis–Ramirez v. U.S. Dep't of Justice*, 758 F.2d 1426, 1430 (11th Cir. 1985) ("Under Rule 10(c) Federal Rules of Civil Procedure, such attachments are considered part of the pleadings for all purposes, including a Rule 12(b)(6) motion.").  While the Federal Rules of Civil Procedure require "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), the "[f]actual allegations must be enough

to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*, at 545. Further, the complaint must "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

Moreover, in reviewing a motion to dismiss, a court must accept the allegations in the complaint as true and "must construe the facts alleged in the light most favorable to the plaintiff." *Hunnings v. Texaco, Inc*., 29 F.3d 1480, 1484 (11th Cir. 1994). However, the court's "duty to accept the facts in the complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205–06 (11th Cir. 2007).  "Indeed, when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Id.*

## 2.        The Statutory Framework of the FTC Act.

The FTC Act "prohibits, and authorizes the Commission to prevent, unfair methods of competition and unfair or deceptive acts or practices." *AMG Cap. Mgmt.*, 141 S. Ct. at 1345; *see* 15 U.S.C. § 45(a) (2006). Through the statutory framework, the FTC Act provides the Commission with administrative tools for declaring specific conduct prohibited under the FTC Act as being "unfair or deceptive." In pertinent part, each of the relevant provisions are discussed below.

### a.        *Section 5(b)– The Commission's Administrative Proceedings*

Earlier this year, in *AMG Capital Management*, the U.S. Supreme Court summarized the administrative procedures articulated under § 5, as follows:

"Section 5 of the [FTC Act] describes the relevant administrative proceedings in some detail. If the Commission has 'reason to believe' that a party 'has been or is using any unfair method of competition or unfair or deceptive act or practice,' it can file a complaint against the claimed violator and adjudicate its claim before an Administrative Law Judge." The ALJ then conducts a hearing and writes a report setting forth findings of fact and reaching a legal conclusion. If the ALJ concludes the conduct at issue was unfair or misleading, the ALJ will issue an order requiring the party to cease and desist from engaging in unlawful conduct. The party may then seek review before the Commission and eventually in a court of appeals, where the 'findings of the Commission as to the facts' (if supported by the evidence) 'shall be conclusive.' If judicial review favors the Commission (or if the time to seek judicial review expires), the Commission's order normally becomes final (and enforceable).

*AMG Cap. Mgmt.*, 141 S. Ct. at 1346.

Importantly, the cease and desist order serves not "to punish or fasten liability on [violators] for past conduct" but rather to "ban *specific* practices for the future" *FTC v. Cement Inst.*, 333 U.S. 683, 706 (1948) (emphasis added). In other words, the cease and desist order defines with specificity what acts or practices are unfair or deceptive within the meaning of Section 5, "because a party violating an imprecise cease and desist order – up to $41,484 per violation or day in violation – may constitute a denial of due process." *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1235 (11th Cir. 2018).

### b. *Section 18 - The Commission's Rulemaking Authority*

Moreover, the Commission may undergo a formal rulemaking process where the Commission issues a specific rule to the public. Under § 57*a*, the Commission prescribes "rules which define with specificity acts or practices which are unfair or deceptive acts in or affecting commerce" within Section 45. 15 U.S.C. § 57a(a)(1)(b) (2011). To that end, before the Commission implements a final rule, the Commission must follow certain statutory procedures, including publishing notice of the proposed rule, seeking comments or arguments from interested persons, and provide an opportunity for an informal hearing, and when the final rule is issued, the issuance of the final rule is coupled with a statement of basis and purpose. *See id.* § 57a(b). All of

these procedures have been included in the cited sections of the FTC Act over the years to ensure due process in the administrative procedure leading up to a Cease and Desist Order if the ALJ initially finds determinative facts and law to support such an Order.   The Commission's rulemaking authority has been broadened and strengthened because these protections are embedded in the rulemaking process, and yet the Commission herein seeks to side step that entire administrative process.

Here, CCPA is not a rule promulgated by the Commission, though Congress explained a violation of CCPA is treated like a violation of a rule. *See* Covid-19 Consumer Protection Act, Pub. L. No. 116-260, § 1401(c)(1), 134 Stat. 1182 (2020). By contrast, the trade regulation rule concerning the sale of Mail, Internet, or Telephone Order Merchandise ("MITOR") is an example of a rule promulgated by the Commission, which defines specific acts as a violation of Section 5 of the FTC Act. *See* 16 C.F.R. § 435.2 (2014); § 57a(a)(1)(b).

### c.   *Section 13(b) – Injunctive Relief Only*

Under Section 13(b) of the FTC Act, the Commission may proceed directly to court (prior to the issuance of the Section 5 cease and desist order) and obtain a "temporary restraining order or a preliminary injunction," and "in proper cases," the Commission may seek to obtain a "permanent injunction." *AMG Cap. Mgmt.*, 141 S. Ct. at 1346. However, in stark contrast, the Supreme Court in *AMG Capital Management* recently confirmed that Section 13(b) does *not* authorize the Commission to obtain court-ordered monetary relief. *Id.* at 1347.

### d.   *Section 19 – Monetary Relief*

Section 19 permits the Commission to seek monetary relief, but Congress imposed specific conditions and safeguards before such monetary relief is available. *See* 15 U.S.C. § 57b. First, relief under § 19 does not become available whenever there is a § 5 violation.  Rather, it is available

only where the Commission shows (1) that there is an existing formal rule identifying the defendant's conduct at issue as being an "unfair or deceptive act [] or practice[]," 15 U.S.C. § 57b(a)(1); or (2) that is has previously issued a "cease and desist order" to the defendant and then proves in court that a "reasonable man would have known under the circumstances that the conduct at issue was dishonest or fraudulent." *AMG Cap. Mgmt.*, 141 S. Ct. at 1349 (citing 15 U.S.C. § 57b(a)(2)).

### e.  *Section 5 – Monetary Relief*

Separately, Section 5(*l*) permits the Commission to seek court-ordered civil penalties against a defendant who violates a final "cease and desist order" issued against *them*, 15 U.S.C. § 45(*l*). Further, Section 5(m) permits two alternative scenarios where the Commission may seek court-ordered civil penalties against *others* who engage in conduct previously identified as prohibited. *Id.* § 45(m). First, under Section 5(m), the Commission may seek civil penalties against a person who "violates any rule" under the FTC Act regarding "unfair or deceptive acts or practices." *Id.* § 45(m)(1)(A). Second, the Commission may seek civil penalties against a person who engages in conduct previously identified as "unfair or deceptive" in an administrative proceeding that resulted in a "cease and desist order."   § 45(m)(1)(B). In either scenario, the defendant must have acted with "actual knowledge" that the act or practice is "unfair or deceptive" and prohibited by the Commission. *Id.* § 45(m)(1)(A), (B).

### B.  THE PLAIN TEXT OF § 13(b) DOES NOT AUTHORIZE A PERMANENT INJUNCTION BASED ONLY ON ACTIONS THAT OCCURRED BEFORE THE FILING OF THE LAWSUIT, OR MONETARY RELIEF (UNDER COUNTS I AND II).

The Commission fails to state a claim under § 13(b) for either Count I or II. First, the Commission has only pled facts against Mr. Romero for past acts and practices and fails to properly

aver facts indicating Trend Deploy is currently violating the FTC Act or there are future threats that Trend Deploy will violate the FTC Act. Second, § 13(b) does not afford the Commission any basis to seek monetary relief.  *See AMG Cap. Mgmt.*, 141. S. Ct. at 1348-49.

"As in all statutory construction cases," the Court's analysis "begin[s] with the language of the statute." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). "When the words of a statute are unambiguous," the "judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). Accordingly, in pertinent part, § 13(b) reads as follows:

> Whenever the Commission has reason to believe--
>
> > (1) that any person, partnership, or corporation *is violating*, or *is about to violate*, any provision of law enforced by the Federal Trade Commission, and
> >
> > (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public--
>
> the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however*, That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further*, That in *proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction*.

15 U.S.C. § 53(b) (emphasis added). As the Supreme Court recently explained, "[t]aken as a whole, the provision focuses upon relief that is prospective, not retrospective." *AMG Cap. Mgmt.*, 141 S. Ct. at 1348. In proper perspective, "[c]onsider the words 'is violating' and 'is about to violate' (not 'has violated') setting forth when the Commission may request injunctive relief." *Id.*; *see Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 774 (7th Cir. 2019) ("Section 13(b)

serves a different, forward-facing role: enjoining ongoing and imminent future violations."); *Fed. Trade Comm'n v. Evans Prod. Co.*, 775 F. 2d 1084, 1087 (9th Cir. 1985) (holding § 13(b) "contemplate[s] ongoing or future violations" and thus "an injunction will issue only if the wrongs are ongoing or likely to recur").

Accordingly, when pleading a cause of action under § 13(b), the FTC remains obliged to "Congress' plain language in Section 13(b), which requires the FTC to plead, at the time it files suit, that violation 'is' occurring or 'is about to' occur." *Fed. Trade Comm'n v. Shire ViroPharma*, *Inc*., 917 F.3d 147, 158 (3d Cir. 2019) (citing 15 U.S.C. § 53(b)) (rejecting the FTC's invitation to construe the FTC Act broadly, finding the court may not "ignore" clear statutory language so as to permit the FTC to "squeeze" past conduct into the "about to violate" proviso of § 13(b)); *see Fed. Trade Comm'n v. AdvoCare Int'l, L.P*., No. 4:19-CV-715-SDJ, 2020 WL 6741968, at *6 (E.D. Tex. Nov. 16, 2020) (granting defendants' motion to dismiss on § 13(b) claim where allegations in complaint indicate that the alleged violative conduct ended 3 months before the FTC filed its lawsuit, finding the FTC failed to sufficiently allege facts that the defendants "are *currently* violating or *are about to* violate the law enforced by the FTC") (original emphasis).

Here, the plain and unambiguous text of §13(b) provides no basis for the Commission to seek a permanent injunction against Mr. Romero based on past conduct, which stopped at least three months *before* the Commission filed this lawsuit. Further, the Commission fails to sufficiently allege facts to support current or future threats that Mr. Romero "is" violating or "is about to" violate the FTC Act.  Consequently, because § 13(b) is clear that the Commission's ability to seek permanent injunctive is limited to present or future violations – as opposed to past actions – the Court "must enforce [its] plan and unambiguous statutory language according to its terms." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010).  Even further, this

**COLE, SCOTT & KISSANE, P.A.**
COLE, SCOTT & KISSANE BUILDING - 9150 SOUTH DADELAND BOULEVARD - SUITE 1400 - P.O. BOX 569015 - MIAMI, FLORIDA 33256 - (305) 350-5300 - (305) 373-2294 FAX

statutory interpretation comports with the Supreme Court's recent explanation that Section 13(b) "addresses a specific problem, namely, that of *stopping* seemingly unfair practices from taking place." *AMG Cap. Mgmt.*, 141 S. Ct. at 1348.

Additionally, as §13(b) is limited to only injunctive relief, not monetary relief, there is no other basis for the Commission to currently invoke §13(b), if not for seeking injunctive relief. *Id.* at 1347-48 (rejecting the Commission's use of Section 13(b) for monetary relief, finding Section 13(b)'s limited purpose under the FTC Act is to obtain injunctive relief); *Shire ViroPharma*, 917 F. 3d at 147 (finding allegation that "[a]bsent an injunction, there is a cognizable danger that [defendant] will engage in similar conduct" because it had the "incentive and opportunity" to do so "woefully inadequate to state a claim under Section 13(b)").

For these reasons, this Court should dismiss the Commission's reliance on §13(b) for relief under Counts I and II because all facts pled are past acts, with no current or future threats; and there is no basis for the Commission to use this § 13(b) for monetary relief.

## C.   THE COMMISSION FAILS TO PLEAD A CLAIM UNDER § 19 OF THE FTC ACT (UNDER COUNT II).

Regarding the alleged false and misrepresentations relative to Trend Deploy's facemasks, the Court should dismiss Count II's request for relief under §19 because the Commission fails to plead that it obtained a "cease and desist order" against Mr. Romero under § 5(b) related to such alleged wrongful acts. [*See generally* D.E. 1].

To the extent the Commission argues it may avoid obtaining a § 5(b) cease and desist order against Mr. Romero by relying on the CCPA being treated "as a rule," Count II still fails. First, the Commission fails to sufficiently plead facts alleging Mr. Romero violated the CCPA because there is no factual support to indicate that Trend Deploy made any representations on treating, curing, preventing, mitigating, or diagnosing COVID-19. [*See generally* D.E. 1]. Second, alleged

**COLE, SCOTT & KISSANE, P.A.**
COLE, SCOTT & KISSANE BUILDING - 9150 SOUTH DADELAND BOULEVARD - SUITE 1400 - P.O. BOX 569015 - MIAMI, FLORIDA 33256 - (305) 350-5300 - (305) 373-2294 FAX

deceptive conduct, which predates the enactment of the CCPA cannot support a claim under § 5(a) because the CCPA is not retroactively applied.

      1.      **The Commission Fails to Allege It Obtained a § 5(b) Cease and Desist Order.**

The Court should dismiss the Commission's request for relief under Section 19 because the Commission has not obtained a "cease and desist order", which is a condition precedent to bringing a civil action for a violation of § 5(a). In *AMG Capital Management*, the Supreme Court recently recognized that limited monetary relief available to the Commission under § 19 has "important limitations," namely: (1) where the Commission begins its § 5 (administrative process) "within three years of the underlying violation and seeks monetary relief within one year of any resulting final cease and desist order." 141 S. Ct. at 1349. Further, §19 applies only "where a reasonable man would have known under the circumstances that the conduct at issue was dishonest or fraudulent." *Id.*

In situations where the Commission is not relying on a promulgated rule to bring a civil action for a § 5(a) violation, the Supreme Court interpreted §19 to require a final cease and desist order for recovery under § 19. *AMG Cap. Mgmt.*, 141 S. Ct. at 1349. The Court explicitly interpreted the condition precedent of the resulting final cease and desist order to apply to unfair and deceptive trade practices. *Id.* at 1349.

Here, the Commission alleges that Trend Deploy began deceptively marketing facemasks at the early onset of the pandemic in March of 2020. [D.E. 1, ¶ 67]. However, because the FTC never issued a cease and desist order regarding the alleged violative marketing practices, Trend Deploy never had actual knowledge that the alleged actions constituted unfair or deceptive conduct in violation of § 5(a). *See AMG Cap. Mgmt.*, 141 S. Ct. at 1349 (noting § 45(m)(1)(B)(2) "provid[es] court-ordered monetary penalties against anyone who engages in conduct previously

identified as prohibited in a final cease and desist order, but only if the violator acted with *actual knowledge that such acts or practices is unfair or deceptive*") (emphasis added). Further, the Commission has admitted that in November and December of 2020, it was continuing to investigate whether Trend Deploy's facemask marketing violated § 5(a) [D.E. 1, ¶¶ 95, 97].

Thus, the Commission cannot obtain monetary relief under § 19.

### 2.    The Commission Fails to State a Claim for "Deceptive Acts or Practices" In Violation of § 5 and the CCPA.

To allege a "deceptive act or practice" in violation of § 5(a), the Commission must first plead facts showing "(1) there was a representation [made by the defendant]; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *Fed. Trade Comm'n v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *Fed. Trade Comm'n v. Transnet Wireless Corp*., 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007). As set forth below, absent a cease and desist order, the Commission must further plead the elements as required under a promulgated rule prior to obtaining § 19 relief. *See* 15 U.S.C. § 45(m)(1)(A).

#### a.    *A Section 5(a) Claim based on Violating the CCPA Requires Pleading the Defendant Engaged in Deceptive Acts Associated with the "Treatment", the "Cure," the "Prevention," the "Mitigation," or the "Diagnosis" of COVID-19, not Merely a Virus*.

The CCPA prohibits any person from "engag[ing] in a deceptive act or practice in or affecting commerce in violation of section 5(a) of the Federal Trade Commission Act (15 U.S.C. 45(a)) that is associated with— (1) the treatment, cure, prevention, mitigation, or diagnosis of COVID–19; or (2) a government benefit related to COVID–19." Covid-19 Consumer Protection Act, at § 1401(b). According to the plain language of the CCPA, the CCPA does not apply to all "viruses" categorically, only the specific COVID-19 coronavirus, as clearly stated in the CCPA.

*See id.; Germain*, 503 U.S. at 254 ("When the words of a statute are unambiguous," the "judicial inquiry is complete.").  Further, "[a] violation of subsection (b) shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B)). *Id.* at § 1401(c)(1).

Thus, what triggers the CCPA is that the (i) alleged material representation made by the Defendant, (ii) which likely misled a reasonable consumer, was (iii) "***associated with [] the treatment, cure, prevention, mitigation, or diagnosis of [iv] COVID-19***." *Id.* at § 1401(b)(1) (emphasis added).

The CCPA defines "COVID-19" to mean the "2019 novel coronavirus," but the CCPA does not define what any of the remainder terms mean. *See id.* According to their plain meaning, "treatment" means "the act or manner or an instance of treating someone or something: such as: the action or way of treating a patient or a condition medically or surgically."[5] Further, "cure" means "to restore to health, soundness, or normality."[6] Note, "prevention" means "the act of preventing or hindering."[7]  Even more, "mitigation" means "the process or result of making something less severe, dangerous, painful, harsh, or damaging."[8] Finally, "diagnosis" means the art or act of identifying a disease from its signs and symptoms."[9]

---

[5] Merriam-Webster, https://www.merriam-webster.com/dictionary/treatment (last visited Aug. 25, 2021).

[6] Merriam-Webster, https://www.merriam-webster.com/dictionary/cure (last visited Aug. 25, 2021).

[7] Merriam-Webster, https://www.merriam-webster.com/dictionary/prevention (last visited Aug. 25, 2021).

[8] Merriam-Webster, https://www.merriam-webster.com/dictionary/mitigation (last visited Aug. 25, 2021).

[9] Merriam-Webster, https://www.merriam-webster.com/dictionary/diagnosis (last visited Aug. 25, 2021).

Here, the FTC has filed a 38-page complaint against Mr. Romero, raising a number of allegations about the markings and efficacy of Trend Deploy's facemasks during the early onset of the pandemic.  But as revealed by the exhibits to the Complaint, none of these allegations relate to COVID-19.  [*See generally* D.E. 1].   Indeed, the inherent failure of Count II is that the Commission does not present facts that Mr. Romero made a material representation that was associated with either (a) the treatment, (b) the cure, (c) the prevention, (d) the mitigation or (e) the diagnosis, of <u>COVID-19</u>.

Instead, the Commission broadly alleges that "on or after December 27, 2020" Trend Deploy represented (1) it will "deliver facemasks with filtration efficiency comparable to that of an N95 respirator," (2) it will "deliver facemasks with a filtration efficiency greater than or equal to 95 percent," (3) it will deliver facemasks that will filter out particles as small as .075 microns, and (4) it will deliver facemasks that prevent virus, including the SARS-CoV-2 virus, from passing through them. [D.E. 1, ¶ 119]. However, even assuming each representation were deceptive, none of the allegations associate such deceptive representation with (a) the treatment, (b) the cure, (c) the prevention, (d) the mitigation or (e) the diagnosis, of COVID-19, as these terms are defined in common parlance (in the absence of being defined in the CCPA). Consequently, none of the alleged deceptive representations within the four corners of the Complaint fall within the scope of the CCPA.

Similarly, while the Commission attempts to allege that Mr. Romero "claimed the Class N95 masks he sold would prevent or mitigate COVID-19," [D.E. 1, ¶¶ 69, 118(i)], the cited exhibits by the Commission expressly contradict any such notion. [D.E. 1, Ex. J; Ex. K]. These exhibits control over the contradictory conclusory statements in the Complaint.  *Irvin,* 496 F. 3d

at 1206. Moreover, alleged failed delivery times have nothing to do with a representation to treat, cure, prevent, mitigate, or diagnose COVID-19. [*See* D.E. 1, ¶¶ 14-19, 21, 23-48, 99-108].

Thus, the Commission cannot rely on CCPA and must comply with the requirements under §5(b) and first obtain a cease and desist order through the required administrative proceeding before it may bring a claim under § 19.

### b. The CCPA Should Not Apply to Alleged Deceptive Acts Occurring Before December 27, 2020.

Finally, in construing whether the Commission pled facts to support a claim under § 5(a) based under the CCPA, this Court should find that the CCPA does not apply retroactively. Thus, alleged deceptive acts occurring before December 27, 2020 do not support a claim under CCPA.

In *Martin v. Hadix*, the Supreme Court affirmed that in the absence of "clear congressional intent," the presumption is "that the [new] statute does not apply to [prior] conduct". 527 U.S. 343, 352-54 (1999). Moreover, in *Landgraf v. USI Film Prod.*, 511 U.S. 244, 280 (1994), the Supreme Court specifically referenced "a statute introducing damages liability" as the type of statute that courts should not apply retroactively. *Id.* at 285 n. 37.

Here, the purpose of the newly enacted CCPA is to permit the Commission to seek monetary penalties even for first-time violations of § 5, *i.e.*, where no "cease and desist order" has yet been issued to the defendant, which is a remedy not normally permitted under the FTC Act. *See AMG Cap. Mgmt.*, 141 S. Ct. at 1348-49 ("[T]he structure of the Act beyond § 13(b) confirms this conclusion. Congress in § 5(*l*) and § 19 gave district courts the authority to impose limited monetary penalties and to award monetary relief in cases where the Commission has *issued cease and desist orders, i.e.*, where the Commission has engaged in administrative proceedings.").

As such, for a Section 5(a) claim not based on a formal rule, the Commission was obligated to deliver to him an administrative Cease and Desist Order. *Id.* Yet, Mr. Romero never received a

cease and desist order prior to the Commission filing its lawsuit. [*See generally* D.E. 1]. Nevertheless, in seeking monetary relief under CCPA, the Commission significantly relies on alleged wrongful conduct that occurred before the CCPA was enacted. [*Compare* D.E. 1, Ex. A (June 11, 2020 screenshot); Ex. B (June 11, 2020 screenshot); Ex. C (June 11, 2020 Screenshot); Ex. D (June 11, 2020 screenshot); Ex. E. (June 11, 2020 screenshot); Ex. F (March 13, 2020 screenshot); Ex. K (December 2, 2020 screenshot); Ex. L (March 27, 2020 Facebook post); Ex. N (undated image); Ex. O (August 13, 2020 Screenshot), *with* D.E. 1, Ex. J (March 19, 2021 screenshot); Ex. M (March 19, 2021 screenshot)]. As noted above, the allegations that fall after December 27, 2020, fail to associate the alleged deceptive representations with the treatment, cure, prevention, mitigation, or diagnosis of COVID-19.

Additionally, applying the CCPA retroactively significantly impairs Mr. Romero's due process rights without notice as Mr. Romero was entitled to obtain a cease and desist order specifying the alleged deceptive acts, thereby affording Mr. Romero an opportunity to cease the alleged conduct prior to the exposure of civil penalties. *See AMG Cap. Mgmt.*, 141 S. Ct. at 1348-49*; see also LabMD*, 894 F.3d at 1235 (recognizing in the case of a cease and desist order, that "a party violating an imprecise cease and desist order – up to $41,484 per violation or day in violation – may constitute a denial of due process"). Therefore, conduct occurring prior to the enactment of the CCPA is not a basis for a claim that Trend Deploy violated the CCPA.

In summary, the Commission is unable to seek monetary relief under § 19 because it failed to obtain a cease and desist order under § 5(b). Further, the CCPA does not save the Commission's claim to avoid the required cease and desist order because the Commission fails to plead facts to show Trend Deploy made any material representations that were associated with either the treatment, the cure, the prevention, the mitigation or the diagnosis, of COVID-19. Finally, conduct

predating December 27, 2020, has no bearing on a claim which could qualify to be made under the CCPA.

## <u>CONCLUSION</u>

Dismissal of the relief under Sections 13(b) and 19 in this action is warranted. There is no basis for entering a § 13(b) permanent injunction based on past conduct where there is no current or imminent violations of the FTC Act (under Counts I and II). Further, the Commission is not entitled to relief under § 19 for its Section 5(a) violation (Count II) because the Commission did not obtain a "cease and desist order" against Mr. Romero under § 5(b) related to the alleged deceptive acts. To the extent the Commission argues it may avoid obtaining a § 5(b) cease and desist order against Mr. Romero by relying on the CCPA being treated "as a rule," since even if that conclusion of the Commission were warranted at law (and there is no current law that unambiguously supports that conclusion), Count II fails because there is no factual support to indicate that Trend Deploy made any representations on treating, curing, preventing, mitigating, or diagnosing COVID-19. Thus, the CCPA is inapplicable. Therefore, this action should be dismissed with prejudice.

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Defendant hereby certifies that on August 30, 2021, counsel from the undersigned law firm conferred in good faith with counsel from the Federal Trade Commission, by a conference telephone call, to resolve the issues raised in this Motion, but the parties have reached an impasse with the Federal Trade Commission opposing this Motion.

**COLE, SCOTT & KISSANE, P.A.**
COLE, SCOTT & KISSANE BUILDING - 9150 SOUTH DADELAND BOULEVARD - SUITE 1400 - P.O. BOX 569015 - MIAMI, FLORIDA 33256 - (305) 350-5300 - (305) 373-2294 FAX

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 30th day of August 2021, a true and correct copy of the foregoing has been furnished by electronic filing with the Clerk of the court via CM/ECF, which will send notice of electronic filing to all counsel of record.

COLE, SCOTT & KISSANE, P.A.
*Counsel for Defendant Frank Romero d/b/a Trend Deploy*
Cole, Scott & Kissane Building
9150 South Dadeland Boulevard, Suite 1400
P.O. Box 569015
Miami, Florida 33256
Telephone (561) 383-9203
Facsimile (305) 373-2294
Primary e-mail: cody.german@csklegal.com
Secondary e-mail: ryan.weiss@csklegal.com
Secondary e-mail: justin.maya@csklegal.com

By:   s/ Cody German
CODY GERMAN
Florida Bar No.:  58654
RYAN WEISS
Florida Bar No.: 114479
JUSTIN S. MAYA
Florida Bar No.:  126087

0439.0831-00/2397178