## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

FEDERAL TRADE COMMISSION,

      Plaintiff,

v.                                    Case No. 5:21-cv-343-BJD-PRL

FRANK ROMERO,

      Defendant.

_____/

## O R D E R

**THIS CAUSE** is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 36), Defendant's Response in Opposition (Doc. 42), and Plaintiff's Reply (Doc. 46).

### A. Background

Plaintiff sues Defendant for violating the Federal Trade Commission (FTC) Act and the COVID-19 Consumer Protection Act (CCPA). (Doc. 1 at 1). Plaintiff alleges Defendant engaged in fraudulent business dealings related to selling personal protective equipment (PPE). Id. at 2–3.

#### a. The Parties

##### i. *Plaintiff: The Federal Trade Commission*

The FTC "is an independent agency of the United States Government created by statute." F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d

1167, 1177 (N.D. Ga 2008), aff'd, 356 F. App'x 358 (11th Cir. 2009) (citing 15 U.S.C. §§ 41–58). The FTC enforces the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a).

"To aid its enforcement of the FTC Act, the FTC has promulgated regulations that require advertisements [ ] (1) to be truthful and not misleading, and (2) to be supported by adequate substantiation for product claims prior to dissemination." Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1177.

Here, Plaintiff alleges Defendant violated Sections 5(a), 5(m)(1)(A), 52, 53(b), 56(a)(1), 57b of the FTC Act; the FTC's Trade Regulation Rule Concerning the Sale of Mail, Internet, or Telephone Order Merchandise (MITOR), 16 C.F.R. § 435; and Section 5(a) of the FTC Act under the COVID-19 Consumer Protection Act (CCPA), Public Law 116-260, 134 Stat 1182, Title XIV, Section 1401.

### ii. *Defendant: Frank Romero*

Defendant does business as a sole proprietor under the name Trend Deploy. (Docs. 36.3 at 24; 36.96 at 14). Defendant's "business model consists of promoting goods on social media" through advertising. (Doc. 36.3 at 24. "Once customers show[ed] interest in a particular ad[vertisement Defendant] created," the customers could visit Trend Deploy's website to shop for the product or good advertised. Id. Defendant manufactures none of the products

or goods, nor does he keep inventory. Id. Instead, when customers purchase products or goods, Defendant contacts his "manufacturers [to] provide them with the customer details so that [the manufacturers] can ship the goods to the customers." Id.

Trend Deploy used electronic commerce (e-commerce) platform Shopify to store both business data and host the domain to the business' website. (Doc. 36.96 at 7). Defendant also used Aliexpress and Oberlo, which are additional e-commerce websites. Id. at 10. All three e-commerce platforms allowed Defendant to select products from manufacturers and post products to his business website. Id. at 7, 10. When Defendant selected products, he imported the product pictures and descriptions from the manufacturers; however, he had the opportunity to select which pictures to post on his website and whether he wanted to edit the product descriptions. Id. at 10. Defendant is the only one who controls and edits the Trend Deploy website. Id. at 18.

When a customer ordered a product, the order was "stored on the Shopify app." Id. at 11. Defendant would then either physically purchase the orders from Aliexpress or "download a batch of orders and send them to [his] manufacturers via email for faster processing[.]" Id.; see also id. at 18. Adam Chan was one manufacturer that Defendant sent lists to. Id. at 23. Mr. Chan contacted Defendant via Aliexpress, "and that [is] when [Defendant] started

- 3 -

buying from [Mr. Chan]." Id. at 24. Mr. Chan lives in China. Id. Golden Bei was a second manufacturer Defendant ordered from, and Defendant's relationship with Golden Bei was similar to Defendant's relationship with Mr. Chan. Id. Defendant communicated with Bei and Chan via email, WhatsApp,[1] and telephone. Id. at 24–25. Defendant's records related to orders were kept through Aliexpress, Shopify, email, and WhatsApp. Id. at 7, 25.

### b. Case Facts

On January 31, 2020, under the Public Health Service Act, Health and Human Services Secretary Alex Azar, II declared a public health emergency related to the COVID-19 pandemic. (Doc. 36.31 at 29). While Defendant disputes certain characteristics of the pandemic, this Court has taken judicial notice about two fundamental basics about the COVID-19 pandemic. (See Doc. 32 at 1–2). First, "COVID-19 is a disease caused by the virus severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), a new virus in humans causing respiratory illness which can be spread from person-to-person." Id. (quotation marks and citation omitted). Second, "COVID-19 was

---

[1] "WhatsApp is an American company that provides messaging, Internet calling, and other services through a smartphone application." United States v. Rivas Nunez, Case No.: 21-12512, 2022 WL 1763767, at *1 (11th Cir. June 1, 2022).

officially declared a pandemic on March 11, 2020 by the World Health Organization." Id. (citation omitted).

On March 13, 2020, Defendant began marketing facemasks, including masks he described as "N95" and "Class N95." (See Doc. 36.77 at 16) (showing Defendant began selling "N95 PM2.5 Anti-Virus Particle Barrier Face Mask[s]" on March 13, 2020); (see also Doc. 36.77 at 5–8; 36.104 at ¶¶ 7, 19).

### i. *Purchase Process*

When customers wanted to purchase a facemask, they had to go through a four-part checkout process. (Doc. 36.104 at ¶ 20). First, customers added the selected facemask to a webpage call "My Cart." Id. at ¶ 21. Second, customers clicked a "CHECK OUT" button, which directed customers to an "Information" page. Id. at ¶ 23. Customers were directed to input their shipping information on the "Information" page. Id. at ¶¶ 23, 25. Third, customers were directed to choose a shipping method. Id. at ¶ 25. Customers were provided "two shipping options: 1) 'Fast Shipping (5-15 days)'; and 2) 'Standard Shipping (3-5 weeks).'" Id. at ¶ 26. Fourth, customers were directed to a payment webpage where they completed their transaction by providing payment information. Id. at ¶ 28.

At the beginning of the COVID-19 pandemic, Defendant changed Trend Deploy's store policy "when [the business] started receiving higher than usual

volume of orders[.]" (Doc. 36.96 at 33). The updated policy stated, "As [a] consequence of the unprecedented novel coronavirus (COVID-19), we're experiencing an unforeseen and unanticipated spike in the volume of orders which may affect our standard shipping/delivery times." (Doc. 36.32 at 7); (see also Doc. 36.31). Defendant updated the store policy because as Trend Deploy "started to receive a higher than normal volume of orders, the manufacturers were having a hard time keeping track of all the lists[.]" (Doc. 36.96 at 40). Defendant knew manufacturers "were taking extra days to . . . make sure to keep up with demand." Id. Accordingly, Defendant updated Trend Deploy' store policy to "let[ ] customers know to be patient because [Trend Deploy was] experiencing a high volume of orders that ha[d] affected [its] shipping and delivery times[.]" Id.

A hyperlink allowing customers direct access to the store policy was available at the "My Cart" stage of the four-part checkout process, but it was not available once customers clicked the "CHECK OUT" button. (See Doc. 36.49 at 19) (showing a "My Cart" webpage with a "STORE POLICY" link at the bottom); (Doc. 36.31 at ¶ 39) ("I also clicked on the 'Store Policy' link at the bottom of the screen and was redirected to trendeploy.com/pages/store-policy."); (Doc. 36.49 at 20–24) (showing that after a customer provided purchase information, the store policy hyperlink disappears from the store footer ribbon).

- 6 -

### ii. *Order Fulfillment*

An FTC data analyst calculated whether facemask orders were either unfulfilled or fulfilled late in a period spanning March 1, 2020 to March 19, 2021. (See Doc. 36.77 at 1, 9). After review, the analyst concluded 104 orders were fulfilled late, and that of the 104 late orders, 95 received no refunds or charge backs. Id. at 9. Additionally, the analyst concluded 219 facemask and facemask filter orders were unfulfilled, and that these orders were not refunded in full or charged back. Id. To determine these values, the analyst used data from Shopify. Id. Defendant attested that the Shopify data could be misleading if Trend Deploy shipped a customer's order through Oberlo, then the order would display as unfulfilled in Shopify. (Doc. 36.99 at 8). However, Defendant also acknowledged that if a tracking number is put into Oberlo, then Shopify will populate the order as fulfilled. Id. at 9. Defendant provides no evidence to rebut the assumption that the Shopify data used by the FTC is appropriate. (See generally Docs. 42; 36.99).

Beginning in April 2020, customers began complaining about not receiving orders. (See Doc. 36.72 at 4–5). (See also Doc. 36.31 at 26) (explaining the FTC found 33 "reviews where consumers shared their [negative] experiences with Trend Deploy"); (Doc. 36.73) (showing the negative reviews); (36.31 at 25) (explaining the FTC found 43 complaints with the Better Business Bureau regarding issues with Trend Deploy); (Docs.

36.70, 36.71) (showing some of the negative complaints filed with the Better Business Bureau, but also showing that few complaints were resolved through refunds or delivered products). PayPal[2] produced documents related to customer disputes with Trend Deploy. (See Doc. 36.31 at ¶ 99) (explaining the production of documents); (Doc. 36.74) (showing 679 disputes that PayPal received from consumers who ordered products from Trend Deploy). "Of the 679 disputes submitted by consumers, 580 of [the disputes] were categorized as "Merchandise or Service Not Received." (Doc. 36.31 at ¶ 100); (see also Doc. 36.74). "Of those 580 disputes[, ] 484 disputes had a 'Transaction Date' on or after March 13, 2020." (Doc. 36.31 at ¶ 100); (see also Doc. 36.74).

From March 19, 2020 through August 20, 2020, Defendant sent a standard email to customers who ordered facemasks. (See Docs. 36.112; 36.113). The standard email contained the same language as in the updated store policy. (Compare Docs. 36.112; 36.113 with Doc. 36.32 at 7). Neither the store policy nor the standard email provided customers an option or avenue to either consent to a delay in shipping or to cancel their order for a prompt refund. (See Docs. 36.32; 36.112; 36.113). A search for the standard email

---

[2] "PayPal is an e-commerce business that facilitates money transfers through the Internet. PayPal typically acts as an intermediary that accepts funds from a buyer and deposits these funds into the account of a seller, subtracting any applicable service charges." Oppenheim v. I.C. Sys., Inc., 627 F.3d 833, 835 (11th Cir. 2010).

sent from Tend Deploy's company email address returned 9,619 results. (Doc. 36.31 at 28).[3]

If customers complained about not timely receiving their orders, or made inquires to the same effect, then Trend Deploy emailed stating, "Once orders have been placed, they're immediately processed and therefore cannot be canceled. If customers contact us regarding cancellations after making a purchase, and the item/s purchased have not yet shipped, we can issue a refund in the form of store credit only." (Doc. 36.31 at 28); (see also Doc. 36.97 at 12). A search for this response email returned 868 results. (Doc. 36.31 at 28).[4]

### iii. *Facemask Quality*

Defendant advertised and sold a variety of facemasks and respirators, purported to be "N95"quality. (Doc. 36.104 at ¶¶ 59, 65–66, 68–72). Defendant relied on representations from his distributors when he confirmed that the N95 masks he sold were certified by the National Institute for

---

[3] "These search results may include email chains where consumers responded to the original message sent by trendeploy@gmail.com, and trendeploy@gmail.com then responded back to the consumer, meaning the search may be overinclusive and may overcount the number of initial emails sent by trendeploy@gmial.com containing the [standard email language]." (Doc. 36.31 at 28). Given Defendant provided records for more than 16,000 orders (Doc. 42.2), it is reasonable to infer the standard email was sent to thousands of consumers.

[4] "[T]he [search] results may include email chains where consumers responded to the original message sent by trendeploy@gmail.com, and trendeploy@gmail.com then responded back to the consumer, meaning the search may be overinclusive and may overcount the number of initial emails sent by trendeploy@gmail.com containing the [standard response email] language[.]" (Doc. 36.31 at 28).

Occupational Safety and Health (NIOSH) and the Food and Drug Administration (FDA). Id. at ¶¶ 76, 129, 165). Defendant posted a "Certification of Registration" with the FDA's logo on it connected to some of the facemasks he sold that were purportedly of "N95" quality. Id. at ¶ 129. Defendant relied on the representations of his distributors when posting the "Certification of Registration" on his website. Id. Additionally, Defendant sent purported NIOSH certifications to customers. Id. at ¶ 99 (showing the NIOSH certification Defendant sent to customers); (see also Docs. 36.86 at 6; 36.122–36.123, 36.125, 36.129, 36.131, 36.133–36.146, 36.148–36.149) (showing emails from trendeploy@gmail.com to various customers with the NIOSH certification Defendant sent to customers).

Defendant admits that he represented to his customers that the facemasks sold on Trend Deploy were certified by either NIOSH or the FDA. (Doc. 36.104 at ¶¶ 175, 177). The FDA did not issue the Certification of Registration. (Doc. 36.80). Additionally, the masks and respirators sold by Defendant with the N95 NIOSH certifications did not withstand testing compatible with a true NIOSH certification. (See generally Doc. 36.79).

### B. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rules), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When the moving party has discharged its burden, the non-moving party must point to evidence in the record to demonstrate a genuine dispute of material fact. Fed. R. Civ. P. 56(c). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry

of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing [the motion]." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995).

### C. Discussion

#### a. Defendant violated the Mail, Internet, or Telephone Order Merchandise Rule (MITOR).

"To aid its enforcement of the FTC Act, the FTC has promulgated regulations[.]" <u>Nat'l Urological Grp., Inc.</u>, 645 F. Supp. 2d at 1177. One such regulation is the MITOR. <u>See</u> 16 C.F.R. § 435.2 (2014). The MITOR prohibits a seller from soliciting any "order for the sale of merchandise to be ordered by [a] buyer . . . via the Internet . . . unless, at the time of the solicitation, the seller has a reasonable basis to expect that it will be able to ship any ordered merchandise to the buyer" either "[w]ithin that time clearly and conspicuously stated in any such solicitation; or [i]f no time is clearly and conspicuously stated, within thirty (30) days after receipt of a properly completed order from the buyer." 16 C.F.R. § 435.2(a)(1) (2014).

If "a seller is unable to ship merchandise within the" aforementioned time, then the seller must "clearly and conspicuously and without prior demand" allow the buyer to either "consent to a delay in shipping or to cancel the buyer's order and receive a prompt refund." 16 C.F.R. § 435.2(b)(1) (2014).

If a "seller fails to offer th[is] option" to the buyer, then the seller must "deem [the] order cancelled and . . . make a prompt refund to the buyer[.]" 16 C.F.R. § 435.2(c)(5) (2014).

In any action brought by the FTC alleging a violation of the MITOR, "the failure of a respondent-seller to have records or other documentary proof establishing its use of systems and procedures which assure compliance, in the ordinary course of business," with any requirement of 16 C.F.R. §§ 435.2(b) or (c) "will create a rebuttable presumption that the seller failed to comply with said requirement." 16 C.F.R. § 435.2(d) (2014).

i. _Defendant did not have a reasonable basis for Trend Deploy's shipping claims._

Defendant did not have a reasonable basis for its shipping claims as required by 16 C.F.R. § 435.2(a)(1). The record shows that Defendant struggled to fulfill facemask orders throughout the beginning of the pandemic. Between March 13, 2020 and July 13, 2020, Defendant received 484 consumer disputes through PayPal alone. (See Docs. 36.31 at ¶¶ 99–100; 36.74). Defendant was aware that the manufacturers he used were struggling with product demand volume. (Doc. 36.96 at 40). Defendant emailed Adam Chan on April 11, 2020, asking for Mr. Chan to "[p]lease handle [the late orders] as quickly as possible[.]" (Doc. 36.28 at 1). The spreadsheet attached to Defendant's email to Mr. Chan included 484 unfulfilled orders of

facemasks and filters. <u>See generally id.</u> Even though Defendant knew 484 orders were late, Defendant continued to solicit and accept customer orders. (<u>See</u> Doc. 36.77 at 9).

Defendant's argument that his website's language was not a solicitation under 16 C.F.R. § 435.2(a)(1) is unavailing. (<u>See</u> Doc. 42 at 14–16). Defendant explained that Trend Deploy used Facebook, Instagram, and YouTube to direct customers to Trend Deploy. (Docs. 36.3 at 24; 36.96 at 8–9). Defendant explained that such advertisements were essential to Trend Deploy's business model. (<u>See</u> Doc. 36.3 at 24). Further, Defendant advertised specific products via social media, and once customers showed interest in a "particular ad," then the customer was sent directly to the Trend Deploy website to purchase the specific product. <u>Id.</u>

Defendant argues that representations from vendors on Aliexpress led Defendant to believe items would timely ship. (Doc. 42 at 17). However, the representations and guarantees from the Aliexpress website do not coincide with or negate what Defendant actually knew. (<u>See</u> Doc. 42.2 at 231–236) (showing different shipping times on the Aliexpress website for different facemask products). Defendant knew Mr. Chan, whom Defendant met through Aliexpress, had not fulfilled at least 484 facemask and filter orders through April 11, 2020. (<u>See</u> Doc. 36.28). Defendant provides screenshots apparently between Defendant and Golden Bei that purportedly show Mr.

- 14 -

Bei guaranteeing facemask delivery within 12 to 15 days. (See Doc. 42.2 at 243–244). Defendant knew Mr. Bei's tracking guarantees were fraudulent when Defendant emailed Mr. Bei on March 30, 2020, concerned with Mr. Bei's shipping pace. (See Doc. 36.30) ("Gold[, I] need the tracking numbers for the [N]95 masks soon!! Please send. Many customers already mad."). (Compare Doc. 36.110 at 20 (showing the full conversation between Defendant and Mr. Bei where Defendant expressed concerns about Mr. Bei's shipping representations) with Doc. 42.2 at 243–244 (showing only a cropped excerpt of the conversation between Defendant and Mr. Bei)). Mr. Bei's guarantees did not match with reality, and Defendant knew he had received complaints from customers who either did not receive their items or received their items inexplicably late. (See Docs. 36.31 at 26; 36.74 at 1–4; 36.85 at 1–4; 36.87 at 1–5; 36.90 at 1–6; 36.92 at 1–4; 36.94 at 1–3; 36.95 at 1–7).

Defendant further attaches documentation showing compliance with shipping representations. (See Doc. 42.2 at 272–1004). However, the documentation purportedly showing compliance does not include the 484 facemask and filter orders sent to Mr. Chan. (Compare Doc. 36.28 at 2–8 with Doc. 42.2 at 272–1004). The 484 order numbers shown in the email between

Defendant and Mr. Chan are not provided in Defendant's Declaration of over 15,000 orders. (See Doc. 42.2).[5]

Additionally, Defendant's documentation purporting to show compliance does not show what kind of products were ordered with each order number. See id. at 272–1004. Defendant sells a variety of products including workout equipment and stethoscope clips used by medical professionals. (Doc. 36.96 at 11); (see also Doc. 36.29) (showing 24 vendors Defendant affiliated with); (Doc. 36.3 at 24) (explaining Defendant's business model was to promote a variety of goods, not exclusively limited to facemasks).

In light of these facts, rather than Defendant having a reasonable basis to claim that facemasks would timely ship—either within 5–15 days or 3–5 weeks—Defendant should have been acutely aware that shipping was, and would be, untimely. Plaintiff discharged its initial burden showing Defendant's noncompliance with his store's shipping times for facemasks. See Clark, 929 F.2d at 608.  Instead of pointing to evidence that shows a genuine issue of material fact, like showing facemask orders that were timely

---

[5] To determine this, the Court took the parties' data and converted each into separate spreadsheets in Microsoft Excel. Then, using Excel functions, this Court first compared the spreadsheets to find the same order numbers. This Court then ran a search to match the customer names between Plaintiff's and Defendant's data. Neither search yielded direct matches either between order numbers or customer names.

fulfilled, Defendant provides a massive spreadsheet with mostly irrelevant information, that does not relate to the inquiry about facemask shipping. See Fed. R. Civ. P. 56(c); Anderson, 477 U.S. at 248; (see also Docs. 36.28 at 2–8, 42.2 at 272–1004).

Based on the evidence provided, no reasonable inference can be drawn that Defendant could reasonably believe facemasks and filters ordered through Trend Deploy would timely ship. See Haves, 52 F.3d at 921; (see also Docs. 36.28 at 1; 36.31 at ¶¶ 99–100; 36.74; 36.96 at 40). Defendant has not shown a genuine dispute of material facts. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); Anderson, 477 U.S. at 247–48 ("[T]he *mere* existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original). Defendant violated 16 C.F.R. § 435.2(a)(1).

    ii. *Defendant did not offer the refund-or-consent option to all necessary customers. Defendant also did not deem orders cancelled and provide prompt refunds after failing to give the refund-or-consent option.*

Defendant does not directly counter Plaintiff's argument that Defendant failed to offer the refund-or-consent option to all necessary customers. (See generally Doc. 42). Defendant argues he only failed to refund customers "on 95 occasions." Id. at 13.

Plaintiff presents evidence that a standard email and Trend Deploy's store policy did not provide customers either an option or avenue to either consent to a delay in shipping or to cancel their order for a prompt refund. (See Docs. 36.32 at 7; 36.112; 36.113). Additionally, if customers inquired about canceling their orders or about not receiving their orders, Defendant responded that orders were "immediately processed" and therefore could not be "canceled." (Doc. 36.31 at 28); (see also Doc. 36.97 at 12).

Because Defendant neither "clearly and conspicuously and without prior demand" allowed customers to either "consent to a delay in shipping or to cancel" their orders, nor did Defendant promptly refund customers, Defendant is in direct violation of 16 C.F.R. §§ 435.2(b)(1); (c)(5).

iii. *Plaintiff is entitled to Defendant's net revenues for violating the MITOR.*

A court has "jurisdiction to grant such relief as the court finds necessary to redress injury to consumers . . . resulting from" violating the MITOR. 15 U.S.C. § 57b(b). "Such relief may include, but shall not be limited to . . . the refund of money or return of property [and] the payment of

- 18 -

damages." Id. However, "nothing in this [statute] is intended to authorize the imposition of any exemplary or punitive damages." Id. The proper measure of damages for a MITOR violation is net revenue. See F.T.C. v. Washington Data Res., Inc., 704 F.3d 1323, 1327 (11th Cir. 2013).

Defendant's net revenue for selling facemasks in violation of MITOR is $989,483.69. (See Doc. 36 at ¶¶ 118, 121–122); (see also Doc. 36.77 at 6) (explaining Defendant's revenues). Defendant argues his net revenue is $11,875.81. (Doc. 42 at 25–26). However, Defendant only accounts for a limited number of items he failed to ship. (See Doc. 42.2 at 1000–10004). As previously explained, Defendant's data points fail to account for many, if not most, of the violations and orders explained by Plaintiff. (Compare Doc. 36.28 at 2–8 with Doc. 42.2 at 272–1004). Additionally, missing from Defendant's data is a breakdown of product type and money earned per order. (See Doc. 42.2 at 272–1000).

Plaintiff has shown, and Defendant has failed to rebut, that there is no genuine dispute as to the amount of Defendant's net revenue and is entitled to summary judgment in the amount of net revenues from Defendant for Defendant's violation of the MITOR. See F. R. Civ. P. 56; Washington Data Res., 704 F.3d at 1327.

### b. Defendant violated Sections 5 and 12 of the FTC Act.

Section 5 of the FTC Act "prohibits, and authorizes the Commission to prevent, . . . 'unfair or deceptive acts or practices.'" AMG Capital Mgmt., LLC v. Federal Trade Commission, 141 S.Ct. 1341, 1345 (2021) (citing 15 U.S.C. §§ 45(a)(1)–(2)). Section 12 of the FTC Act prohibits sellers from disseminating false advertisements. See 15 U.S.C. § 52. Specifically, Section 12 prohibits sellers to disseminate false advertisements "[b]y any means, for the purpose of inducing, or which is likely to induce directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics." 15 U.S.C. § 52(a)(2).

Given that "Section 12 addresses false advertising and provides that the dissemination of false advertisements—defined as advertisements that are misleading in a material respect—is an unfair or deceptive practice in commerce," a "violation of Section 12, dissemination of false advertising, constitutes a violation of Section 5[ ]." Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1188 (quoting F.T.C. v. QT, Inc., 448 F. Supp. 2d 908, 957 (N.D. Ill. 2006), aff'd, 512 F.3d 858 (7th Cir. 2008)).

To establish a violation of Sections 5 and 12, "the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." F.T.C. v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003).

First, the FTC must demonstrate whether a representation was made. A court must determine "whether the advertisements made the claims asserted by the FTC in the complaint." Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1189. "The meaning of an advertisement, the claims or the net impressions communicated to reasonable consumers, is fundamentally a question of fact." Id. However, "[t]his question of fact may be resolved by the terms of the advertisement itself or by evidence of what consumers interpreted the advertisement to convey." Id. "If the advertisement explicitly states or clearly and conspicuously implies a claim, the court need not look to extrinsic evidence to ascertain whether the advertisement made the claim." Id.

Second, the FTC must demonstrate whether a claim is likely to mislead a reasonable customer. In doing so, "the FTC may proceed under a 'falsity theory,' a 'reasonable basis theory,' or both. Id. at 1190. Here, Plaintiff advances under the reasonable basis theory. (See generally Doc. 36). "If the FTC proceeds under a 'reasonable basis' theory, it must demonstrate that the advertiser lacked a reasonable basis—or adequate substantiation—for asserting that the message was true." Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1190.

Third, the FTC must demonstrate that the representation was material. "A representation or omission is material if it is the kind usually

relied on by a reasonably prudent person." Id. (quotation and citations omitted). "A claim is considered material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." QT, Inc., 448 F. Supp. 2d at 960. "Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumptively material." F.T.C. v. Windward Mktg., Inc., Case No.: 1:96-cv-615F, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997). Additionally, "claims that significantly involve health, safety, or other issues that would concern reasonable customers' [are] presumptively material." Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1190 (quoting QT, Inc., 448 F. Supp. 2d at 960, 956–66).

The FTC argues Defendant made 4 representations: (1) that purchased goods would ship within 5–15 days for "Fast Shipping" or within 3–5 weeks for "Standard Shipping;" (2) that the masks Defendant sold were certified by NIOSH and the FDA; (3) that the masks sold were proper N95 masks; and (4) that Defendant's "Class N95" masks "had filtration efficiencies comparable to N95 respirators," "had filtration efficiencies of greater than or equal to 95 percent," and would "prevent viruses, including the CoV-2-virus, from passing through" the masks." (Doc. 36 at 38–42); (see also Doc. 1 at ¶¶ 33–98) (alleging the representations Defendant made); Nat'l Urological Grp., Inc.,

645 F. Supp. 2d at 1189 (explaining that a court must determine "whether the advertisements made the claims asserted by the FTC in the complaint"). The Court will evaluate each representation using the three-part test.

### i. *Defendant's Representations Regarding Shipping Times*

First, Defendant represented two shipping times, either "Fast Shipping," where facemasks would ship within 5–15 days or "Standard Shipping," where facemasks would ship within 3–5 weeks. (Doc. 36.104 at ¶ 26). This representation was made on the Trend Deploy "Shipping Method" webpage, with no disclaimers regarding shipping times appearing on the same webpage. Id. at ¶¶ 26–27. The two shipping options explicitly state that facemasks would ship either along the "Fast Shipping" or "Standard Shipping" timeline. Accordingly, Defendant made a representation about the shipping time for products sold on Trend Deploy. See Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1189.

Second, this Court has determined that Defendant lacked a reasonable basis to represent that facemasks would timely ship under the shipping methods used by Trend Deploy. See Section (C)(a)(i) supra. Defendant's representations were likely to, and did indeed, mislead customers. See Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 11; (see also Docs. 36.85 at 1–4; 36.87 at 1–5; 36.90 at 1–6; 36.92 at 1–4; 36.94 at 1–3; 36.95 at 1–7).

Third, given the shipping representations were express, they are presumptively material. See Windward Mktg., Inc., 1997 WL 33642380, at *10. Even if the claims were not express, customers relied on the representations when making their orders. (See Doc. 36.31 at 26) (explaining customer complaints); (Doc. 36.74) (providing customer complaints submitted through PayPal and showing customers specifically complaining about selecting products for their shipping time, but not timely receiving their products).

Given that Defendant represented that customers would timely receive facemasks within one of the two shipping options available, that Defendant lacked a reasonable basis to make such a representation, and that Defendant's representation about shipping times was material, Defendant, as a matter of law, violated Sections 5 and 12 of the FTC Act. See Tashman, 318 F.3d at 1277.

    ii.   *Defendant's Representations Regarding NIOSH and FDA Certifications*

First, Defendant explicitly stated the facemasks sold on Trend Deploy were certified by either NIOSH or the FDA. On the Trend Deploy website, Defendant listed the facemasks as "N95" masks. (See Doc. 36.104 at ¶¶ 59, 65–66, 68–72). Further, in response to customer inquiries, Defendant emailed a purported NIOSH certification to prove the quality of the masks he sold on

Trend Deploy. (See Docs. 36.86 at 6;  36.122–36.123, 36.125, 36.129, 36.131, 36.133–36.146, 36.148–36.149). Defendant also posted to Trend Deploy a "Certification of Registration" with the FDA logo on the certification on webpages selling facemasks. (See Doc. 36.104 at ¶ 129). Defendant expressly represented his N95 masks were certified by NIOSH or the FDA. See Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1189.

Second, Defendant lacked a reasonable basis to assert that the masks he sold were NIOSH or FDA approved. (See Doc. 36 at ¶¶ 59–69). Defendant admits he never sought approval from either NIOSH or the FDA. (See Doc. 36.104 at ¶¶ 102–103) (admitting Defendant did not seek or obtain approval from NIOSH); (Doc. 36.96) (admitting Defendant neither personally obtained the FDA certification posted to Trend Deploy nor knew whether the FDA approved the masks Defendant sold on Trend Deploy). Defendant argues that NIOSH itself did not know what an "N95" mask was in the beginning of the COVID-19 pandemic, and therefore his lack of reasonable basis is excused. (See Doc. 42 at 4–7). However, this argument bolsters that Defendant himself could not have properly represented that the masks he sold on Trend Deploy were approved by NIOSH if, according to Defendant, such a certification did not exist. Defendant's representations that the facemasks and respirators sold on Trend Deploy were approved by NIOSH or the FDA were likely to

mislead a reasonable customer. See Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1190.

Third, Defendant's representations about the quality of the facemasks and respirators were likely to, and did, mislead customers. Customers repeatedly emailed Defendant to question the quality of the masks sold on Trend Deploy. (See Docs. 36.86 at 6;  36.122–36.123, 36.125, 36.129, 36.131, 36.133–36.146, 36.148–36.149). These customers wanted to purchase quality facemasks to protect themselves in the COVID-19 pandemic. (See, e.g. Doc. 36.86 at 1) ("I work at a hospital in Southern California, and wanted to order N95 masks to better protect myself from COVID-19."); (Doc. 36.123) ("I purchased several of these masks for protection from COVID-19. . . . Have these been tested to prove their N95 equivalent?"). See also QT, Inc., 448 F. Supp. 2d at 960. Defendant's representations about the quality of the facemasks were directly related to the novel COVID-19 pandemic, and the representations were material to customers searching for products to prevent the spread of the disease. See Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1190; QT, Inc., 448 F. Supp. 2d at 960, 956–66. Defendant violated Sections 5 and 12 of the FTC Act in representing the facemasks sold on Trend Deploy were NIOSH or FDA approved. See Tashman, 318 F.3d at 1277.

### iii.  *Defendant's Representations Regarding Whether the Masks Sold Were Proper N95 Masks and Regarding the Class N95 Masks' Functionality*

The final two representations Defendant made about the N95 and Class N95 masks sold on Trend Deploy follow the same logic employed in evaluating the claims regarding the NIOSH and FDA approvals. Defendant argues that he relied on his vendors' representations, and therefore had a reasonable basis to believe the N95 and Class N95 facemasks and respirators sold were of proper quality. (See Doc. 42 at 7–12). Defendant argues that the "Buyer Protection Guarantee" offered by Aliexpress is enough for Defendant to have reasonably believed his products were of proper quality. Id. at 19.

Defendant's argument fails. Defendant admitted he did not seek approval from either NIOSH or the FDA to certify the products he sold were of certifiable quality. (See Docs. 36.104 at ¶¶ 102–103; 36.96). When Defendant was repeatedly confronted with customer questions and concerns about the quality of the masks he sold, Defendant sent customers copies of a purported NIOSH certification. (See, e.g., Doc. 36.123) ("I purchased several of these masks for protection from COVID-19. . . . Have these been tested to prove their N95 equivalent?"); (Doc. 36.125) ("Are these masks genuine N95? . . . Please advise and provide specifications that your masks are indeed N95s."); (Doc. 36.133) ("I am interested [in] the N95 masks . . . and . . . filters

you offer. I would like to know what type of certification for quality you have for those products.").

Additionally, Defendant's e-commerce domain host, Shopify, alerted Defendant that his claims about the quality of his facemasks were unsubstantiated. (See Doc. 36.166) (showing an email thread from April 2020 between a risk analyst from Shopify and Defendant where the analyst explains Defendant was mischaracterizing the quality of the facemasks Defendant was selling). In corresponding with Shopify, Defendant admitted that he did not know how to substantiate that the products he sold had proper NIOSH or FDA certification. (See Doc. 36.21) ("I do sell N95 masks but, besides the certificate provided by the manufacturer [I] by from, [I] have no other way of verifying [the facemasks] being N95 specifically."). Shopify ultimately prohibited Defendant from using the Shopify platform to process payments from customers. (See Docs. 36.118 at 5; 36.99 at 5; 36.110 at 32). Shopify prohibited Defendant from using the e-commerce platform to process payments because of Defendant's unsubstantiated claims about the facemasks. (See Docs. 36.21, 36.118; 36.99 at 5).

Defendant's belief in the representations of his vendors was unreasonable, proven by the unrebutted facts. Defendant knew the facemasks were not of proper quality, as he was informed by Shopify, as he

was questioned by customers, and as he knew he had not sought either NIOSH or FDA approval for the products he sold.

For the same reasons Defendant violated Sections 5 and 12 of the FTC Act when claiming his products were NIOSH or FDA certified, Defendant violated the FTC Act by representing his products were of proper N95 quality and could function the way proper N95 facemasks work. See Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1189–90; QT, Inc., 448 F. Supp. 2d at 960, 956–66; Tashman, 318 F.3d at 1277.

### c. Defendant violated Section 5 of the FTC Act Pursuant to the COVID-19 Consumer Protection Act (CCPA).

The CCPA was enacted on December 27, 2020. It prohibits "any person, partnership, or corporation to engage in a deceptive act or practice in or affecting commerce in violation of section 5(a) of the [FTC] Act (15 U.S.C. 45(a)) that is associated with the treatment, cure, prevention, mitigation, or diagnosis of COVID-19[.]" Public Law 116-260, 134 Stat 1182, Title XIV, Section 1401(b)(1). The CCPA is enforced by the FTC. Id. at Section 1401(c).

To show a violation of the CCPA, the FTC must show a defendant (1) made a representation on or after December 27, 2020 and during the pendency of a "public health emergency declared pursuant to" 42 U.S.C.§ 247d, (2) that the representation "violat[ed S]ection 5(a) of the" FTC Act, and

(3) that the representations were "associated with the treatment, cure, prevention, mitigation, or diagnosis of COVID-19. Id. at Section 1401(b)(1).

Neither party disputes that in January 2020under 42 U.S.C. § 247d, the Health and Human Services Secretary Alex Azar, II declared a public health emergency related to the COVID-19 pandemic. (See generally Doc. 42); (see also Doc. 36.31 at 29). The Court has found Plaintiff is entitled to summary judgment on violations of Section 5 of the FTC Act. See Section (C)(b) supra. Defendant argues Plaintiff failed to demonstrate that Defendant's representations were associated with the treatment, prevention, or mitigation of COVID-19. (See Doc. 42 at 24–25).

Defendant testified that the "Class N95" facemasks sold on Trend Deploy were "antivirus" and that he believed "antivirus" means the masks "might prevent a virus." (Doc. 36.96 at 58). Additionally, Defendant admitted that he "associated [the] N95 facemasks [he sold] with COVID-19 prevention or mitigation" through advertising on social media "using the hashtags 'coronavirus' and 'antivirus [ ] mask.'" (Doc. 36.104 at ¶ 75). Defendant neither disputes or presents any contrary evidence regarding his testimony or admissions. Given there is no genuine dispute of material fact, Plaintiff is entitled to summary judgment regarding Defendant's violation of Section 5 of the FTC Act under the CCPA. See Fed. R. Civ. P. 56(a).

### d. Defendant is Liable for a Civil Penalty under 15 U.S.C. § 45(m).

The FTC Act allows the Commission to bring a civil lawsuit to recover a civil penalty against any person who "violates any rule under th[e] subchapter respecting unfair or deceptive acts or practices . . . with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A). The maximum civil penalty applicable to this case is $43,280.00 per violation. See 16 C.F.R. § 1.98 (2020) (showing the maximum penalties for various violations of the FTC Act, adjusting for inflation, and effective from January 14, 2020 to January 21, 2021).

"In determining the amount of such a civil penalty, the court shall take into account the degree of culpability, any history of prior such conduct, [defendant's] ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15 U.S.C. § 45(m)(1)(C).

Defendant testified that he became aware of the MITOR in November 2020. (Doc. 36.96 at 41). Plaintiff informed Defendant of both the MITOR and of Sections 5 and 12 of the FTC Act by also informing Defendant he was under investigation for violating both. (See Doc. 36.2). Despite Plaintiff's notification, Defendant continued making representations about, and selling, his facemask products in violation of both MITOR and Sections 5 and 12 of

- 31 -

the FTC Act. (See generally Doc. 36.77). Defendant is liable for a civil penalty under 15 U.S.C. § 45(m)(1)(C).

Defendant sought to sell N95-quality facemasks and respirators during the COVID-19 pandemic, knowing that quality of mask could prevent a virus. (Docs. 36.96 at 58; 36.104 at ¶ 75). Defendant knew customers were seeking N95-quality masks to protect themselves from the coronavirus. (See Docs. 36.86 at 6;  36.122–36.123, 36.125, 36.129, 36.131, 36.133–36.146, 36.148–36.149) (showing customers emailing Defendant requesting verification that the masks the customers had ordered were N95-quality masks). Defendant was culpable in making representations that were deceiving, in violation of MITOR and Sections 5 and 12 of the FTC Act.

Defendant can pay a civil penalty. (See Doc. 42.2 at 272–1000) (showing customer orders); (Doc. 36.77 at 6) (showing Defendant earned $1,253,258.50 from facemask and filter orders from March 1, 2020 through March 19, 2021). Plaintiff has not provided evidence of whether Defendant has previously engaged in any similar violations of either MITOR or the FTC Act. (See generally Doc. 36).

Considering the 15 U.S.C. § 45(m)(1)(C) factors, this Court will impose a civil penalty of $2,565.21. Defendant earned $591.86 from sales violating the MITOR. (See Doc. 36 at ¶¶ 126, 129); (see also Doc. 36.77 at 6–7). Defendant earned $262.21 from FTC Act violations. (See Doc. 36 at ¶¶ 127,

129); (see also Doc. 36.77 at 7). Defendant's total revenue from violating MITOR and the FTC Act is $854.07. This Court will multiply the penalty of $954.07 for treble damages for a total penalty of $2,562.21.

"Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future . . . violations." S.E.C. v. Monterosso, 756 F.3d 1326, 1338 (11th Cir. 2014). The FTC Act allows a court discretion to "determin[e] the amount of such a civil penalty." 15 U.S.C. § 45(m)(1)(C). Where agencies have sought civil penalties, courts have allowed "an appropriate multiplier," usually of treble or double damages. United States v. Dish Network L.L.C., 954 F.3d 970, 980 (7th Cir. 2020) (citing additional cases explaining multipliers in admiralty and antitrust cases).

### e. Defendant is Liable for Injunctive Relief Under 15 U.S.C. § 53(b).

Under Section 13(b) of the FTC Act, "[w]henever the [Federal Trade Commission has reason to believe that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the [FTC] . . . the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). The Act "permits the Commission to use both its own administrative proceedings . . . and court actions in exercising this authority." AMG Capital Mgmt., LLC v. Federal Trade Commission, 141 S.Ct. 1341, 1345 (2021).

A district court may grant injunctive relief when a "defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." Sec. and Exch. Comm'n v. Blatt, 583 F.2d 1325, 1334 (5th Cir. 1978).[6] To grant injunctive relief, a district court must find the Commission "offer[ed] positive proof of the likelihood that the wrongdoing will recur." Id. (citing SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 99–100 (2d Cir. 1978)).

Defendant sells clothing to consumers in the United States through a separate company, Uvenux. (Docs. 36.96 at 13–15; 36.104 at ¶ 4). When confronted with advertising difficulties given social media companies regulating ads related to the COVID-19 pandemic, Defendant explained that his advertising "pages ke[pt] getting banned because they have the same name." (Doc. 36.107 at 6–7). Further, Defendant had the ability "to change [his] domain and start from zero again . . . so that [F]acebook [would] not block [Defendant] anymore[.]" Id. at 7. Additionally, Plaintiff has presented evidence that Defendant is engaging in the same behavior violating the MITOR by misrepresenting shipping times and not allowing customers the opportunity the refund-or-consent option required under the MITOR. (See

---

[6] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Doc. 36.97 at 5). Defendant does not dispute this evidence. (See generally Doc. 42).

Given Defendant's violations as explained in this order, given Defendant's behavior in engaging in deceptive acts or practices in misrepresenting claims related to selling facemasks during the COVID-19 pandemic, and given Defendant's proficiency in and ability to make further violations, the "FTC has proven a 'cognizable danger' of a recurrent violation." F.T.C. v. Washington Data Res., Inc., 856 F. Supp. 2d 1247, 1282 (M.D. Fla. 2012), aff'd, 704 F.3d 1323 (11th Cir. 2013). A permanent injunction is warranted.

Local Rule 3.01(f) of the Local Rules for the Middle District of Florida prevented Plaintiff from filing a proposed order of injunctive relief along with its motion for summary judgment. As the Court has determined a permanent injunction is warranted, Plaintiff shall file a proposed order enjoining Defendant from future violations of Sections 5 and 12 of the FTC Act.

"The [FTC] is not limited to prohibiting" violations of the FTC Act "in the precise form in which" the previous violation "is found to have existed in the past." F.T.C. v. Colgate-Palmolive Co., 380 U.S. 374, 395 (1965) (quoting F.T.C. v. Ruberoid Co., 343 U.S. 470, 473 (1952)). If a defendant is found in violation of the FTC Act, then the defendant "must expect some fencing in." Colgate-Palmolive Co., 380 U.S. at 395 (quoting F.T.C. v. Nat'l Lead Co., 352

U.S. 419, 431 (1957)). "Theses 'fencing in' provisions are needed to prevent similar and related violations from occurring in the future." <u>Trans World Accts., Inc. v. F.T.C.</u>, 594 F.2d 212, 215 (9th Cir. 1979).

Plaintiff's proposed order shall define specific terms, then explain specific limits on Defendant's future conduct. The proposed order may ban conduct related to Defendant's violations outlined in this Order, and Plaintiff may suggest further prohibited conduct that Defendant shall be enjoined from. Defendant may respond to Plaintiff's proposed injunction. "However, the [C]ourt cautions [Defendant] that it is persuaded by case law that 'injunctive relief may be broader than the violations alleged in the complaint as long as the relief is reasonably related to the violations of the FTC Act which occurred, and is not too indefinite." <u>Nat'l Urological Grp., Inc.</u>, 645 F. Supp. 2d at 1215 (quoting <u>United States v. Vend Direct, Inc.</u>, Case No.: 06-cv-02423-MSK-MEH, 2007 WL, 3407357, at *2 (D. Colo. Nov. 13, 2007)); <u>see also</u> <u>F.T.C. v. SlimAmerica, Inc.</u>, 77 F. Supp. 2d 1263, 1275 (S.D. Fla. 1999) ("Broad injunctive provisions are often necessary to prevent transgressors from violating the law in a new guise.") (citation omitted).

Accordingly, after due consideration, it is

**ORDERED:**

1. Plaintiff's Motion for Summary Judgment (Doc. 36) is **GRANTED**.

2. Plaintiff is **DIRECTED** to file a proposed judgment consistent with this order **on or before March 24, 2023. On or before April 7, 2023**, Defendant may respond.

3. Plaintiff is **FUTHER DIRECTED** to file a proposed order of injunctive relief **on or before March 23, 2023. On or before April 7, 2023**, Defendant may respond.

4. The Clerk of Court shall **terminate** all pending motions.

**DONE** and **ORDERED** in Jacksonville, Florida this 21ᵗʰ day of February 2023.

BRIAN J. DAVIS
United States District Judge

8
Copies furnished to:

Counsel of Record